# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 14, 2012 Session

## PORSHA PERKINS v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 08C733      Barbara N. Haynes, Judge**
_____

**No. M2010-02021-SC-R11-CV - Filed August 22, 2012**
_____

An employee of an agency of the Metropolitan Government of Nashville and Davidson County ("Metro") was discharged after she filed complaints with the Equal Employment Opportunity Commission and a lawsuit against Metro alleging employment discrimination. The employee appealed her termination to the Metro Civil Service Commission and eventually settled the appeal, receiving backpay and other consideration in exchange for her agreement not to apply for or accept future employment with the agency that discharged her. The employee subsequently filed a complaint against Metro alleging, among other things, retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). Metro filed a motion seeking summary judgment. The trial court granted the motion, reasoning that the employee could not establish that her termination constituted an adverse employment action because she had accepted backpay and agreed not to be reinstated as part of the settlement of her Civil Service Commission appeal. The Court of Appeals affirmed. We conclude that the employee's acceptance of the settlement does not preclude her from establishing that her termination constituted an adverse employment action for purposes of her federal retaliatory discharge claims. We reverse the judgment of the Court of Appeals, vacate the judgment of the trial court granting Metro summary judgment, and remand this matter to the trial court for further proceedings consistent with this decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Vacated and Case Remanded**

CORNELIA A. CLARK, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Joseph Howell Johnston, Nashville, Tennessee, for the appellant, Porsha Perkins.

Saul Solomon, Director of Law, Department of Law of the Metropolitan Government of Nashville and Davidson County; J. Brooks Fox and Christopher M. Lackey, Assistant Metropolitan Attorneys, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

William B. Ryan and Bryce W. Ashby, Memphis, Tennessee; Justin S. Gilbert, Jackson, Tennessee; Jennifer B. Morton, Knoxville, Tennessee; and Wade B. Cowan and Douglas B. Janney, III, Nashville, Tennessee, for the Amicus Curiae, Tennessee Employment Lawyers Association.

## OPINION

### Factual and Procedural Background

In 2001, Porsha Perkins ("Plaintiff") began working as a Family Services Specialist for the Metropolitan Action Commission ("MAC"), an agency of Metro responsible for administering the Head Start Program for underprivileged children. Plaintiff is an African-American female over the age of forty. In September of 2004, MAC terminated Plaintiff for allegedly falsifying her time card. On October 28, 2004, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Tennessee Human Rights Commission ("THRC"), alleging that her termination resulted from age-based discrimination.

On December 3, 2004, MAC reinstated Plaintiff but imposed a one-day suspension without pay for allegedly coercing her co-worker to make a false statement. On December 20, 2004, Plaintiff filed a second EEOC complaint,[1] this time alleging that the one-day suspension was in retaliation for her initial EEOC complaint.

On October 31, 2005, Plaintiff filed a lawsuit against MAC and Metro in the Chancery Court for Davidson County, alleging that the one-day suspension constituted employment discrimination based on her age and race and that the suspension had been imposed in retaliation for her EEOC and THRC complaints.

Plaintiff's lawsuit and complaints remained unresolved when two incidents allegedly occurred on November 16, 2005. Plaintiff reported that a co-worker struck a child with a broom, while the co-worker reported that Plaintiff pinched a child of pre-school age, leaving a visible mark on his arm. MAC began an internal investigation, and on November 21, 2005, MAC placed Plaintiff on paid administrative leave pending the outcome of its investigation

---

[1] This second EEOC complaint is not in the record, but it is mentioned in the complaint that Plaintiff filed on October 31, 2005, which is part of the record on appeal.

of the alleged incident. MAC also reported the allegation to the Tennessee Department of Children's Services ("DCS") and the Tennessee Department of Human Services ("DHS"), as required by law.[2] These agencies also investigated the alleged incident.[3]

Although Plaintiff denied the allegation from the beginning, DCS and DHS found probable cause that Plaintiff had pinched the child. On the recommendation of DHS, MAC adopted a temporary safety plan on November 22, 2005, that prohibited Plaintiff from being left alone with children. Based on a mistaken belief that the investigation had been concluded, DHS later advised MAC that Plaintiff posed a risk to small children and would be subject to a permanent safety plan prohibiting her from being left alone with children. Plaintiff retained counsel and requested an evidentiary hearing. Thereafter, DHS sent a letter to MAC, dated January 12, 2006, stating that the investigation into the allegation against Plaintiff had not been completed, as previously mistakenly reported, and that the November 22, 2005 temporary safety plan should be reinstated.

However, in a letter dated January 13, 2006, MAC terminated Plaintiff's employment, citing the permanent safety plan and explaining that, as a small agency, MAC could not assume the burden of guaranteeing that Plaintiff would not be left alone with children.

Plaintiff appealed her termination to the Metro Civil Service Commission.[4] Plaintiff also filed a third EEOC complaint on September 11, 2006, amended September 20, 2006, in which she alleged that her termination constituted retaliation for her previous EEOC complaints and October 31, 2005 lawsuit against Metro.

Meanwhile, by a letter dated February 2, 2007, DCS advised Plaintiff that, as the result of an administrative hearing, it had reviewed the investigation that identified her as the perpetrator of child abuse and had determined that the allegation of child abuse against her was "unfounded." DCS provided a copy of this letter to MAC and advised MAC that "all restrictions" in the November 22, 2005 safety plan had been lifted and were null and void.

On August 2, 2007, eighteen months after her termination, the parties signed a Release and Settlement Agreement ("Settlement"), which provided in relevant part:

---

[2] Tenn. Code Ann. § 37-1-403(a)(1) (2010).

[3] The record indicates these agencies conducted a joint investigation.

[4] The parties do not dispute that Plaintiff appealed her termination to the Metro Civil Service Commission, but the record in this appeal does not include any documents from that appeal.

The undersigned, PORSHA PERKINS, enters into this settlement agreement and release of liability for the consideration of Forty-five Thousand ($45,000.00) Dollars paid to her, the receipt of which is acknowledged, do indemnify, release, and forever discharge THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, its agents, servants, and successors or assigns, from any and all actions, claims and demands including but not limited to claims or actions exercising subrogation rights, for contribution, and/or indemnity of whatever nature now existing, including any consequences thereof now existing or which may develop, whether or not such consequences are known or anticipated, and including all costs of litigation (discretionary or otherwise) or which may hereafter arise out of allegations described below:

. . . .

The undersigned, PORSHA PERKINS, hereby further acknowledges the following as the complete terms of this settlement set out below:

1. Forty-Five Thousand ($45,000) Dollars issued by check to Joseph H. Johnston, attorney for Porsha Perkins, and Porsha Perkins;

2. The Metropolitan Action Commission (MAC) will expunge her personnel file of references to: dishonesty and child abuse. The "Security Alert" memo will not be circulated again;

3. Ms. Perkins' complaint filed with the EEOC is not a part of this agreement;

4. Ms. Perkins retains any right she has accrued in a pension from the Metropolitan Government;

5. Ms. Perkins will never apply for and never be rehired by MAC (or whatever it may subsequently be named). If[] Ms. Perkins ever has a reason to enter onto the premises of MAC (o[r] any facilities which it operates) as a visitor or employee of another entity, she will provide reasonable notice to the Executive Director of MAC;

6. The matter before the Civil Service Commission (Docket No. 43.02-093130J) regarding the termination of Porsha Perkins from MAC, is dismissed with prejudice, under separate Order;

4

7. The matter before the Chancery Court of Davidson County (Docket No. 05-2681-I) regarding the alleged violation of Porsha Perkins by MAC due to retaliation arising from a one-day suspension, is dismissed with prejudice under separate Order. The Metropolitan Government will pay any pending court costs in this matter; and

8. The matter before the Chancery Court of Davidson County (Docket No. 07-677-III) regarding the alleged denial of the procedural due process rights of Porsha Perkins for lack of hearing[,] notice[,] and incorrect burden of proof in a hearing regarding a one-day suspension from MAC is dismissed with prejudice under separate Order.[5] The Metropolitan Government will pay any pending court costs in this matter.

She further acknowledges:

(1) That no additional promise or agreement has been made as consideration for this Release and the signing thereof has not been induced by any representation of the parties released, or by anyone on their behalf, concerning the nature, extent or duration of the injuries or damages sustained, if any, or any other matter.

(2) That the parties have denied wrongdoing or liability in whole or in part, and that the payment and other consideration acknowledged in this Release was made without admission of wrongdoing or liability and received in discharge, compromise, settlement and satisfaction of all actions, claims and demands heretofore described.

On March 10, 2008, approximately seven months after the Settlement, Plaintiff filed a complaint against Metro in the Circuit Court for Davidson County.[6] Plaintiff alleged, as relevant to this appeal, that her termination on January 13, 2006, amounted to retaliation for the charges she had filed with the EEOC and for her October 31, 2005 employment discrimination lawsuit against Metro. Plaintiff asserted that her retaliatory discharge violated Title VII, 42 U.S.C. § 2000e (2006), and the ADEA, 29 U.S.C. §§ 623-634 (2006).

---

[5] The record on appeal does not include any documents from this case (Docket No. 07-677-III).

[6] Plaintiff also named Ms. Cynthia Croom, Executive Director of MAC, and Ms. Cassandra Johnson-Payne, Human Resources Director of MAC, as defendants. However, Ms. Croom and Ms. Johnson-Payne were dismissed from the lawsuit by an agreed order filed June 10, 2010, and are not parties to this appeal.

Relying on Title VII and 42 U.S.C. § 1981a (2006), Plaintiff sought "back pay (less a set-off of $45,000.00 pursuant to her previous settlement of her civil service appeal)," front pay, lost benefits, and "compensatory damages not to exceed $300,000 . . . for public humiliation, embarrassment, and mental distress against [Metro]." Under the ADEA, Plaintiff sought "back pay (less any set-off by the previous $45,000.00 settlement of [her] civil service appeal)," front pay, and lost benefits, "plus an award of liquidated damages against [Metro] under 29 U.S.C. § 626(b) in an amount equal to the amount of back pay so awarded."[7]

Metro moved for summary judgment, and on June 21, 2010, the trial court granted Metro summary judgment on two grounds. First, the trial court, consistent with the law in effect at the time,[8] held that Plaintiff had failed to carry her burden to show that the nondiscriminatory reasons proffered by Metro for her termination were merely "pretextual." Second, the trial court noted that Plaintiff had already received "back pay over this incident and *agreed not to be reinstated*, both to her satisfaction." Therefore, the trial court held that Plaintiff, "as a matter of law, cannot prove that she was 'adversely affected' by her employment termination in this case in any material way."

On appeal, Metro conceded that the first basis for the trial court's grant of summary judgment was error in light of Gossett; however, Metro relied on the second ground cited by the trial court—that Metro had negated a necessary element of Plaintiff's retaliatory discharge causes of action. Relying on federal decisions holding that an employee who voluntarily transfers or resigns may not claim that the transfer or resignation constituted an adverse employment action, Metro argued that an employee who voluntarily agrees not to be reinstated as part of a settlement should be precluded from arguing that her termination constituted an adverse employment action.

The Court of Appeals recognized that the authority Metro cited was distinguishable, as it involved voluntary transfers and resignations. Perkins v. Metro. Gov't of Nashville &

---

[7] On April 29, 2010, the trial court entered an agreed order granting Metro's motion to "place this matter under seal, for the reasons stated in the motion . . . . " Metro's motion is not in the record on appeal; thus, we have no way of knowing the grounds for the motion; however, the record remains under seal.

[8] See Anderson v. Standard Register Co., 857 S.W.2d 555, 556 (Tenn. 1993) (adopting the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973)). This Court later overruled the Anderson decision by holding that the burden-shifting framework of McDonnell Douglas does not apply at the summary judgment stage in Tennessee. Gossett v. Tractor Supply Co., 320 S.W.3d 777, 785 (Tenn. 2010). In response to this Court's decision in Gossett, the General Assembly enacted Tennessee Code Annotated section 4-21-311(e) (2011). This case does not require us to address or to reconcile Gossett and Tennessee Code Annotated section 4-21-311(e).

Davidson Cnty., No. M2010-02021-COA-R3-CV, 2011 WL 3793498, at *6 (Tenn. Ct. App. Aug. 25, 2011). Nevertheless, the Court of Appeals held that because Plaintiff had surrendered her right to be reinstated in exchange for "valuable consideration equivalent to back pay for all the months between her termination and the date of the settlement, her termination can no longer be considered adverse." Id. at *7. The Court of Appeals determined that "the question is not one of sufficiency of damages. Instead, it is whether there existed, after the settlement agreement, an adverse employment action." Id. The Court of Appeals held that the settlement foreclosed Plaintiff's subsequent claims of retaliatory discharge, despite the settlement provision, stating: "Ms. Perkins' complaint filed with the EEOC is not a part of this agreement." Id. at *8. Accordingly, the Court of Appeals affirmed the trial court's decision granting Metro summary judgment.

We granted Plaintiff's application for permission to appeal.

**Standard of Review**

Familiar standards govern Plaintiff's appeal from the trial court's order granting Metro summary judgment. First, settlement agreements are contracts between the parties, and the rules governing the interpretation of contracts apply to settlement agreements. See Waddle v. Elrod, 367 S.W.3d 217, 222 (Tenn. 2012). Issues concerning contractual interpretation are reviewed de novo. Allmand v. Pavletic, 292 S.W.3d 618, 624-25 (Tenn. 2009).

Second, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; see also Martin v. Norfolk S. Ry., 271 S.W.3d 76, 83 (Tenn. 2008). The moving party bears the burden of establishing that no genuine issues of material fact are in dispute and that summary judgment is appropriate as a matter of law. Byrd v. Hall, 847 S.W.2d 208, 215 (Tenn. 1993). The moving party may make the required showing by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial. Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 5 (Tenn. 2008). If the moving party fails to satisfy this initial burden of production, the trial court must dismiss the summary judgment motion. Id. If the moving party makes a properly supported motion, however, then the nonmoving party must produce evidence of specific facts establishing the existence of genuine issues of material fact. Martin, 271 S.W.3d at 84.

In adjudicating motions for summary judgment, courts must view the evidence in the light most favorable to the nonmoving party and resolve doubts concerning the existence of

genuine issues of material fact in favor of the nonmoving party. Id. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." Byrd, 847 S.W.2d at 215. A disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." Id. We review de novo with no presumption of correctness a trial court's decision on a motion for summary judgment. Martin, 271 S.W.3d at 84.

**Analysis**

The narrow issue in this appeal is whether the courts below erred in concluding that Metro negated an essential element of Plaintiff's retaliatory discharge claims under Title VII and the ADEA. Title VII's antiretaliation provision states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (2006). The antiretaliation provision serves to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 63 (2006); see also Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997) (recognizing that the "primary purpose" of Title VII's antiretaliation provision is "[m]aintaining unfettered access to statutory remedial mechanisms").

A prima facie claim of retaliatory discharge under Title VII consists of four elements: (1) the employee engaged in activity protected under Title VII; (2) the employer knew the employee had engaged in protected activity; (3) the employer subsequently took an adverse retaliatory action against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected. Randolph v. Ohio Dept. of Youth Serv., 453 F.3d 724, 736 (6th Cir. 2006) (citing Smith v. City of Salem, 378 F.3d 566, 570 (6th Cir. 2004); Morris v. Oldham Cnty. Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)).

The ADEA also includes an antiretaliation provision that prohibits an employer from "discriminat[ing] against any of his employees . . . because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d) (2006). A prima facie claim of retaliatory discharge under the ADEA also consists of four elements: (1) the employee engaged in

activity protected by the ADEA; (2) the employer knew the employee had engaged in protected activity; (3) the employer thereafter took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action. Spengler v. Worthington Cylinders, 615 F.3d 481, 491-92 (6th Cir. 2010) (citing Fox v. Eagle Distrib. Co., 510 F.3d 587, 591 (6th Cir. 2007)).

Plaintiff argues that the courts below erred by concluding that Metro negated the third element of her retaliatory discharge claims—adverse employer action. Our resolution of this issue necessarily begins with Burlington Northern, in which the United States Supreme Court clarified both the scope of Title VII's antiretaliation provision and the standard for determining whether a plaintiff has satisfied the "adverse action" element of a retaliation claim.[9] The Burlington Northern Court first held that the scope of Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. at 64.[10]

While the Court broadly interpreted the scope of the antiretaliation provision to "extend[] beyond workplace-related or employment-related retaliatory acts and harm," id. at 67, the Court emphasized that the provision only protects against "retaliation that produces an injury or harm." Id. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." 548 U.S. at 68. Rather, protection extends to "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." Id. (internal quotation marks omitted).

The Court adopted an objective standard to differentiate petty slights from retaliatory action. Id. To satisfy this standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotation marks omitted). "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position,"

---

[9] Although Burlington Northern was a Title VII case, federal courts have applied its definition of adverse action when analyzing ADEA retaliation claims as well. See, e.g., Spengler, 615 F.3d at 491; Harman v. Unisys Corp., 356 F. App'x 638, 641 (4th Cir. 2009); Brown v. Northside Hosp., 311 F. App'x 217, 224 (11th Cir. 2009); Fox, 510 F.3d at 591; Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 201 (2d Cir. 2006). Metro has not argued that Burlington Northern is inapplicable to Plaintiff's ADEA retaliation claim.

[10] This Court applied the Burlington Northern holdings in Allen v. McPhee, 240 S.W.3d 803, 820 (Tenn. 2007), abrogated on other grounds by Gossett, 320 S.W.3d at 783-84.

the Burlington Northern standard "screen[s] out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." Id. at 69-70.

Particularly pertinent to this appeal is the Burlington Northern Court's application of the objective standard it adopted to the facts before it. Sheila White, the female employee in Burlington Northern, had previous experience operating forklifts and was hired as a railroad "track laborer," a job that entailed "removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage from the right-of-way." 548 U.S. at 57. She was immediately assigned to operate a forklift. Although she performed some of the other duties of a track laborer, operation of a forklift remained her primary responsibility until she complained to company officials about sexual harassment by her male supervisor. Id. at 57-58. After her complaint, the employer removed White from forklift duty and assigned her to perform only "standard track laborer tasks," while more senior male employees were assigned to perform the less difficult and cleaner job of forklift operator. Id. at 58.

White filed two complaints with the EEOC, the first of which claimed that the reassignment of her duties amounted to unlawful gender-based discrimination and retaliation for her earlier complaint, and the second of which claimed retaliatory supervisor harassment. Id. A few days after White filed the second EEOC complaint, she was suspended without pay for alleged insubordination. Id. White invoked the employer's internal grievance procedures, which resulted in a finding that she had not been insubordinate. Id. The employer reinstated White and awarded her backpay for the thirty-seven days she had been suspended. Id. at 58-59.

White thereafter filed an additional retaliation complaint with the EEOC based on the thirty-seven day suspension, and after exhausting administrative remedies, she sued the employer, alleging a Title VII retaliation claim. Id. at 59. A jury returned a verdict in White's favor, finding that the employer's reassignment of White from forklift duty to standard track laborer tasks and White's thirty-seven day suspension without pay amounted to retaliation. Id. at 70.

Before the United States Supreme Court, the employer argued that White's thirty-seven day suspension without pay "lacked statutory significance" because the company "ultimately reinstated White with backpay." 548 U.S. at 71. The employer contended that "'it defies reason to believe that Congress would have considered a rescinded investigatory suspension with full back pay' to be unlawful, particularly because Title VII throughout much of its history, provided no relief in an equitable action for victims in White's position." Id. at 71-72. The United States Supreme Court rejected these arguments:

10

We do not find Burlington's last mentioned reference to the nature of Title VII's remedies convincing. After all, throughout its history, Title VII has provided for injunctions to bar like discrimination in the future, an important form of relief. And we have no reason to believe that a court could not have issued an injunction where an employer suspended an employee for retaliatory purposes, even if that employer later provided backpay. In any event, Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover compensatory (as White received here) and punitive damages, concluding that the additional remedies were necessary to help make victims whole. We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances.

Neither do we find convincing any claim of insufficient evidence. White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having "no income, no money" in fact caused. ("That was the worst Christmas I had out of my life. No income, no money, and that made all of us feel bad. . . . I got very depressed"). Indeed, she obtained medical treatment for her emotional distress. A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay. . . . Thus, the jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one.

548 U.S. at 72-73 (internal citations and quotation marks omitted).

Relying on Burlington Northern, Plaintiff maintains that if an employee's loss of income for thirty-seven days followed by reinstatement and backpay constitutes a materially adverse action for purposes of a Title VII retaliation claim, then her January 13, 2006 termination and subsequent loss of income for eighteen months constitutes a materially adverse action as well, notwithstanding the terms of the Settlement.

As in the Court of Appeals, Metro relies upon decisions holding that voluntary transfers and resignations cannot be cited as adverse action. See, e.g., Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 521 (8th Cir. 2011); Pownall v. City of Perrysburg,

11

63 F. App'x 819, 823 (6th Cir. 2003); Hammon v. DHL Airways, Inc., 165 F.3d 441, 447 (6th Cir. 1999); Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998). As in the courts below, Metro analogizes Plaintiff's acceptance of the Settlement to a voluntary resignation and argues that, having agreed to "never apply for and never be rehired by MAC," Plaintiff "cannot cite the termination now as a 'materially adverse action by her employer.'" Metro argues that Burlington Northern is distinguishable because the employee there had "no say" in the reinstatement and backpay she received. We agree with Plaintiff that Burlington Northern is controlling.

Burlington Northern instructs that whether a particular action is materially adverse must be "judged from the perspective of a reasonable person in the plaintiff's position." 548 U.S. at 71 (internal quotation marks omitted).[11] Termination is the archetypal example of adverse employment action. We have no doubt that a rational trier of fact could conclude that a reasonable person in Plaintiff's position on January 13, 2006, would have viewed the termination as materially adverse. As the United States Supreme Court held in Burlington Northern, "[a] reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former." Id. at 73.

We also find Metro's attempt to distinguish Burlington Northern unpersuasive. While this case is factually distinct from Burlington Northern, those differences actually support Plaintiff's position on appeal. For example, while the employee in Burlington Northern lived without an income for only thirty-seven days, Plaintiff lost her income for almost eighteen months.[12] While the employee in Burlington Northern was merely suspended, Plaintiff was terminated.

The factual similarities between this case and Burlington Northern also bolster Plaintiff's position on appeal. The employee in Burlington Northern successfully challenged her suspension through the employer's internal grievance procedure and received reinstatement and backpay when she prevailed on her grievance. Yet the Supreme Court rejected the employer's argument that her acceptance of reinstatement and backpay retroactively erased the adverse action—her unpaid suspension.

---

[11] In contrast, the Court of Appeals in this case framed the issue as "whether there existed, *after the settlement agreement*, an adverse employment action." Perkins, 2011 WL 3793498, at *7 (emphasis added).

[12] After her termination, Plaintiff sought unemployment benefits, and her claim was approved. Metro appealed, contending that she was not eligible for benefits because she had been discharged for work-related misconduct. A full hearing resulted in a finding of insufficient evidence of work-related misconduct, and Plaintiff received unemployment benefits. Perkins, 2011 WL 3793498, at *3 n.3.

12

Similarly, Plaintiff pursued a remedy available to her as an employee of Metro by appealing her termination to the Metro Civil Service Commission. Plaintiff's pursuit of the appeal culminated in the Settlement by which she received backpay of $45,000 and other consideration and agreed not to seek future employment with MAC. Nevertheless, Plaintiff's acceptance of the Settlement did not and could not alter the fact that she was terminated from her job and paycheck on January 13, 2006, and remained terminated for almost eighteen months before the Settlement. For purposes of her retaliation claims, Plaintiff's acceptance of the Settlement is not distinguishable from the Burlington Northern employee's acceptance of backpay and reinstatement.[13] Like the United States Supreme Court in Burlington Northern, we conclude that Plaintiff's acceptance of the Settlement does not preclude her, as a matter of law, from establishing the adverse employment action element of her retaliatory discharge claims.

Our holding in this regard is consistent with the intent of Plaintiff and Metro as reflected by the Settlement, which expressly excluded Plaintiff's EEOC complaints, stating: "Ms. Perkins' complaint filed with the EEOC is not a part of this agreement." Admittedly, the first paragraph of the Settlement uses broad language that, if read in isolation, arguably could be viewed as precluding all claims arising from Plaintiff's termination. Contract provisions are not read in isolation, however. Rather, courts must construe contracts as a whole and ascertain the parties' intent from the "'usual, natural, and ordinary meaning of the contractual language.'" Teter v. Republic Parking Sys., Inc., 181 S.W.3d 330, 342 (Tenn. 2005) (quoting Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999)). All provisions of a contract "should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract."

---

[13] As the United States Supreme Court pointed out in Burlington Northern, an employee may be able to obtain injunctive relief or other monetary relief under Title VII, in addition to backpay and reinstatement. 548 U.S. at 72. As already noted, Plaintiff is seeking damages pursuant to a federal statute which authorizes the recovery of compensatory damages, including "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" up to $300,000. 42 U.S.C. § 1981a (b)(3)(D). This same statute authorizes parties seeking compensatory damages to demand a jury trial on a Title VII retaliation claim. 42 U.S.C. § 1981a (c)(1). Under the ADEA, Plaintiff is seeking "back pay (less any set-off by the previous $45,000.00 settlement of Plaintiff's civil service appeal)," front pay, and lost benefits, "plus an award of liquidated damages . . . under 29 U.S.C. § 626(b) in an amount equal to the amount of back pay so awarded." Additionally, should Plaintiff prevail on either of her claims, she may seek to recover reasonable attorney's fees. See 42 U.S.C. § 1988(b) (2006); 42 U.S.C. § 2000e-5(k) (2006). Although Metro and Plaintiff entered an agreed order stipulating that Plaintiff has no separate cause of action under 42 U.S.C. § 1981a, that same agreed order recognizes that § 1981a provides remedies for violations of Title VII. Accordingly, Plaintiff's consent to the agreed order cannot be deemed a waiver of her right to seek damages pursuant to § 1981a.

Guiliano, 995 S.W.2d at 95. Read as a whole, the Settlement evinces Plaintiff's and Metro's intent to exclude Plaintiff's Title VII and ADEA claims.[14]

## Conclusion

Because the Settlement neither alters the fact of Plaintiff's termination nor reflects the parties' intent to resolve Plaintiff's Title VII and ADEA claims, we conclude that the courts below erred in holding that Metro negated the adverse employment action element of Plaintiff's retaliatory discharge claims.[15] Accordingly, the judgment of the Court of Appeals is reversed, and the trial court's order granting summary judgment to Metro is vacated. This matter is remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Metropolitan Government of Nashville and Davidson County, for which execution, if necessary, may issue.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

---

[14] We also note that a release of ADEA claims is not effective unless it specifically refers to the ADEA claims to which it applies. Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427-28 (1998).

[15] By this disposition, we intimate no view as to either the ultimate resolution of Plaintiff's retaliatory discharge claims or the resolution of any other issues that may arise on remand.