## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0505n.06

Case No. 16-5051

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

**FILED**

Aug 25, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MAVERICK GROUP MARKETING, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| WORX ENVIRONMENTAL PRODUCTS, | ) | STATES DISTRICT COURT FOR |
| LTD., d/b/a Worx Environmental Products, | ) | THE WESTERN DISTRICT OF |
| Inc.; WORX ENVIRONMENTAL | ) | TENNESSEE |
| PRODUCTS OF CANADA, INC., d/b/a Worx | ) | |
| Environmental Products, Inc., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BOGGS, CLAY, and SUTTON, Circuit Judges.

BOGGS, Circuit Judge. Worx Environmental Products hired Maverick Group Marketing to market its hand cleaner to Wal-Mart. After Maverick pitched the product to Wal-Mart for several years, making significant progress, but without signing a deal, Worx fired Maverick. Worx then completed a sale of the cleaner to Wal-Mart and refused to pay Maverick a commission. Maverick sued for breach of contract in Tennessee and Worx removed the case to the United States District Court for the Western District of Tennessee. After a four-day bench trial, the district court ruled in favor of Worx. We affirm.

Maverick argues that Worx had no right to terminate their working relationship based on the "MANA Code of Ethics," located on the signature page of the marketing contract, but below

the signatures. The district court rejected this argument on summary judgment, and we review that decision de novo. *See Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005). MANA stands for the Manufacturers' Agents National Association, and its Code of Ethics provides principles for professional and effective business partnerships. Maverick directs our attention to the following provisions of the Code that appear toward the middle of the appended language:

2.      To be accorded the Agent by the Manufacturer:

☐ Enter into a fair and clearly worded written agreement with the Manufacturers' Agent;

☐ Make the agreement cancellable by either party during its first year on suitable advance written notice, but subsequently only for failure of either party to comply with its terms, or by mutual consent;

According to Maverick, the language after the second checkbox in the above-quoted passage prevents Worx from terminating the contract after it has been in effect for more than one year.

We disagree. The formatting of the contract shows that the parties did not intend for the MANA Code of Ethics to be legally binding. The Code is printed in a rectangular box on the signature page below the signature lines, separate from the eleven numbered paragraphs that make up the body of the contract. It is separately numbered, printed in smaller text than the paragraphs, and contains checkboxes, which are not checked, to the left of each provision.

In addition, several of the Code's provisions are clearly aspirational. One provision states that the agent should "[c]onscientiously cover the territory assigned," and another states that the manufacturer should "[a]gree to practical and dignified means for friendly arbitration." The Code also states that a third-party agent should "[c]ooperate to enhance the professional relationship of the Manufacturers' Agent and his Principal," even though the relationship between Maverick and Worx did not involve a third-party agent. In fact, the specific provision

2

of the Code that Maverick invokes is written in the form of an aspirational statement. It is phrased as a suggestion for how a manufacturer should "[m]ake the agreement," and does not contain legally binding language such as "shall."

Contrast that with Paragraph Six of the contract, which describes the process for contract termination and uses the word "shall" several times:

> This Agreement shall continue in full force and effect until the date ("Termination Date") set forth in a notice given by one party to the other indicating such party's election to terminate this Agreement, which Termination Date shall be at least one hundred twenty (120) days after the date notice of such election is given. Alternately, this Agreement may be terminated at any time by mutual written agreement between both parties hereto.

**R. 59-4 at 4.** Paragraph Six says nothing about the contract being perpetual after it has been in effect for more than one year and appears to contradict the provision of the MANA Code of Ethics cited by Maverick, providing further evidence that the Code's aspirational language was not meant to be legally binding. Paragraph Six does not reference the Code, and in fact, none of the paragraphs in the contract above the signature lines mentions the Code. If the parties had wanted the MANA Code of Ethics to be legally binding, they could have said so in Paragraph Six—or anywhere in the body of the contract—but they declined to do so. In our view, Paragraph Six provides the proper procedure for terminating the contract, and Code provision that Maverick cites is not legally binding. The district court was correct to grant summary judgment on this issue.

Maverick's next argument is that it is entitled to a commission from sales to Wal-Mart based on the following language in Paragraph Six:

> If this Agreement shall terminate for any reason whatsoever, Agent shall be entitled to receive his full fees determined in accordance with provisions of Paragraph Four with respect to orders solicited prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of

such termination) and regardless of when such shipments are made or invoices rendered.

Maverick argues that it solicited an order from Wal-Mart before the termination date—July 8, 2009—and is therefore entitled to a commission. The district court ruled at the summary-judgment stage that the meaning of "orders solicited" was ambiguous and conducted a four-day bench trial. After hearing the testimony of numerous witnesses, the court found as a fact that an "order" is "solicited" in the special case of Wal-Mart only after five events occur: (1) the manufacturer must have obtained a supplier agreement; (2) there must have been product testing; (3) the manufacturer must have reached an agreement with Wal-Mart on pricing; (4) an item number must have been issued by Wal-Mart; and (5) Wal-Mart must have placed an order. The first three events occurred before the termination date, but Wal-Mart did not issue an item number and place its first order until late July, several weeks after the termination date. As a result, the court concluded that Worx did not have to pay Maverick a commission.

Determining the appropriate standard of review is complicated. As we have previously noted, "whether resolution of a contractual ambiguity presents a question of law or question of fact can be a thorny problem." *JNJ Logistics, LLC v. Scottsdale Ins. Co.*, 617 F. App'x 464, 469 (6th Cir. 2015) (citing Randall H. Warner, *All Mixed Up About Contract: When is Contract Interpretation a Legal Question and When Is It a Fact Question?*, 5 Va. L. & Bus. Rev. 81 (2010)). In Tennessee, when a contract is ambiguous, "a court applies established rules of construction to determine the parties' intent." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). If ambiguity remains after the court has applied the pertinent rules of construction, "the legal meaning of the contract" becomes "a question of fact." *Ibid.* (quoting *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)).

Following the *Planters Gin* framework, the district court ruled at the summary-judgment stage that the contract was ambiguous after applying the pertinent rules of construction and proceeded to trial for a resolution of "disputed facts." Whether the contract is ambiguous is a legal question, which we review de novo, but the proper resolution of that ambiguity is a factual question. *See Planters Gin*, 78 S.W.3d at 885. Under the Federal Rules of Civil Procedure, which apply in this diversity-jurisdiction case, Fed. R. Civ. P. 81(c)(1), we must not disturb the district court's factual findings unless they are clearly erroneous, Fed. R. Civ. P. 52(a)(6).

The standard of review is dispositive in this case. As we see it, the meaning of "orders solicited" in Paragraph Six is ambiguous, and the district court's resolution of that ambiguity was not clearly erroneous. Maverick notes that the meaning of "solicit" is "to approach with a request or plea (as in selling or begging)." *Webster's Third New International Dictionary* 2169 (1986). We acknowledge that Maverick solicited Wal-Mart for business, but as Worx points out, Paragraph Six provides a commission for "orders solicited prior to the effective date of . . . termination." Thus, the question is not whether Maverick engaged in any conduct that could be characterized as soliciting, but whether Maverick solicited an *order* from Wal-Mart prior to the termination date.

The words "orders solicited" can reasonably be read as describing a scenario in which Wal-Mart has affirmatively committed to buying products from Worx. Without such a commitment, Wal-Mart could simply walk away from the negotiating table without having placed an order, and in that situation, it would be natural to conclude that no "orders" were "solicited" by Maverick prior to the termination date. To put it simply, it makes sense to say that there can be no "orders solicited" unless Wal-Mart has actually placed an order. That did not occur in this case, at least, not before the termination date. Although Worx negotiated a selling

price with Wal-Mart before the termination date, Wal-Mart did not order any products from Worx until July 31, 2009, several weeks after the termination date on July 8.

The contract does contemplate that an "order" can be "solicited" by Maverick before it is "accepted" by Worx, but that observation does not contradict the district court's interpretation. If Wal-Mart made an offer to buy a certain number of products at a certain price, Worx would have been free to accept or reject that offer. *See Safeco Ins. Co. of Am. v. City of White House*, 36 F.3d 540, 546 (6th Cir. 1994) ("For an agreement to be enforced as a contract, there must be mutual assent; one party must accept the other party's offer."); *Hoover Motor Express Co. v. Clements Paper Co.*, 241 S.W.2d 851, 852 (Tenn. 1951) ("[I]n order to convert into a contract an offer for which no consideration was paid there must be an acceptance of that offer before it is withdrawn."). As long as Wal-Mart made an offer before the termination date, Maverick would be entitled to a commission even if Worx accepted the offer after the termination date. Thus, there remains a meaningful distinction between solicitation and acceptance under the district court's interpretation of the contract.

Admittedly, this interpretation is not particularly favorable to Maverick, as it allows Worx to terminate the contract before receiving an offer from Wal-Mart without paying a dime to Maverick. But given the ambiguous terms of the contract, it is unclear where else the line between developing a relationship and soliciting an order should be drawn. Maverick's argument leaves a host of questions unanswered: Does merely placing a phone call to Wal-Mart constitute the solicitation of an order? If so, how quickly must an order be placed for Maverick to earn a commission? What if Wal-Mart initially declined to place an order, but then placed an order five years after the initial sales pitch—what then? Although the district court's

6

interpretation is not favorable to Maverick, it provides a coherent and sensible reading of Paragraph Six of the contract.

If Maverick had wanted greater protection against the possibility of termination, it could have negotiated a better contract before agreeing to represent Worx. The President and founder of Maverick, John Garrison, testified that he had previously done business with Wal-Mart, and he was therefore familiar with the complex process of marketing a product to Wal-Mart. Garrison could have asked for an up-front retainer fee or reimbursement of certain expenses, but instead, he decided to represent Worx in exchange for only the prospect of commissions from orders solicited. That decision left him vulnerable to the possibility that Worx would terminate their relationship without compensation after coming under new management, and that is exactly what happened in this case.

By all accounts, Maverick spent considerable time and treasure navigating the intensely competitive process of marketing a product to one of the world's largest retailers. By denying Maverick the fruits of its labor when it was close to reaching a deal with Wal-Mart, Worx acted unfairly, to say the least. Unfortunately for Maverick, the district court did not clearly err in its factual finding that the contract's ambiguous terms do not provide the relief that Maverick seeks. The district court's judgment is AFFIRMED.

**CLAY, Circuit Judge, dissenting.**  The district court in this case determined that "orders solicited" is an ambiguous phrase, even though—based on plain meaning and common usage—it is not.  The district court then construed this claimed ambiguity—even though there was none—against the incorrect party.  And as if that was not enough, the district court, instead of attempting to divine the intent of the parties, based its interpretation of this phrase on testimony from a witness whose testimony was given far more weight than warranted by the circumstances.  Any one of these errors is enough to reverse its decision.  Taken together, it is obvious that the district court ignored well-settled contract principles and stacked one error upon another.  I therefore dissent and would reverse the judgment below.[1]

I.

In arriving at its conclusion that "orders solicited" is an ambiguous phrase, the majority downplays or leaves out a few things along the way.  Here is the full story.

Maverick is a marketing company for automotive-related products and is owned solely by John Garrison.  Worx is a manufacturer of an industrial-strength hand cleaner.  Garrison was introduced to Worx when he met Brent Keeley, one of Worx's vice presidents, at a trade show in 2006.  Then, beginning in December 2006, Garrison started approaching Wal-Mart on Worx's behalf, and actually had a meeting at Wal-Mart's headquarters to market Worx's hand cleaner.

On February 12, 2007, Maverick and Worx executed a marketing contract, under which Maverick acted as a sales representative for Worx.  The contract, which was drafted by Worx, provided, in pertinent part:

---

[1] I do, however, agree with the majority's holding that the "MANA Code of Ethics" is not part of the contract.  As the majority points out, the "MANA Code of Ethics" appears below the signature line, set-off from the rest of the contract, and uses aspirational, goal-oriented language in describing the relationship between Maverick and Worx.  However, I part ways with the majority as to whether "orders solicited" is an ambiguous phrase, and also because the way in which the district court interpreted that phrase was clearly erroneous.

> **Agent's Commissions.** The commissions payable by Principal to Agent on orders solicited within or delivered to the Territory shall be 8% ("Commission Rate"). Commissions shall be deemed earned by Agent upon acceptance or delivery of the order by Principal, whichever occurs first.

R. 23-1, Marketing Agency Agreement, PageID# 141 (emphasis in original).

The contract also provided that upon termination of the contract, Maverick would be entitled to payment for "*orders solicited* prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination)[.]" *Id.* at 142 (parenthesis in original) (emphasis added).

From 2006 to 2009, Garrison, working through his company (Maverick), did a number of things to try to get Worx's hand cleaner into Wal-Mart—he sent "somewhere over 500" emails, made at least eight trips to Bentonville, Arkansas (Wal-Mart's headquarters), and put Worx's product in several different distribution centers for testing. R. 114, Trial Transcript, PageID# 3792-93. Throughout all this time, Garrison received no compensation from Worx.

On March 10, 2009, Sergio Abarca, another of Worx's vice presidents, emailed Garrison to tell him that his marketing contract was being terminated effective July 10, 2009. On March 25, 2009, fifteen days after sending that email, Abarca negotiated a deal with Wal-Mart to carry Worx's hand cleaner. Abarca announced on July 2, 2009 that Worx had reached a deal and signed a three-year contract with Wal-Mart to offer its hand cleaner in its stores. On July 27, 2009, Wal-Mart assigned to Worx an item number. Worx received its first order from Wal-Mart on July 31, 2009—almost three weeks after Maverick's termination went into effect.

Worx never paid a commission or fee to Garrison, and Garrison argued he was entitled to a commission because he solicited an offer from Wal-Mart prior to being terminated by Worx. This is what the dispute is all about.

II.

The district court ruled on summary judgment that the phrase "orders solicited" was ambiguous because, in the context of this case, that phrase is "of uncertain meaning and may be fairly understood in more ways than one." R. 78, Summary Judgment Ruling, PageID# 2889 (internal quotation marks and citation omitted). At the same time, though, the court recognized that the natural and ordinary meaning of the word "solicit" is "to petition to or to approach with a request or plea." *Id.* (internal quotation marks omitted). Thus, the court said, "taking this meaning as determinative, the Court would have to rule, as a matter of law, for Maverick: no dispute exists that Maverick indeed petitioned Wal-Mart for business." *Id.* Notwithstanding this statement, the court ordered the parties to trial on the meaning of the phrase "orders solicited."

At trial, both parties offered testimony on the meaning of "orders solicited." For his part, Garrison testified that the word "solicited" meant "[t]rying to get the business." R. 114 at 3771. Garrison, who said that he had been in the retail business since the 1970s, did not know of any other meaning of the word. He also testified that the word has no special meaning within the context of the retail industry. Keeley (one of Worx's vice presidents) had a similar understanding of the word "solicited." He explained his understanding in this way:

> Solicited, if someone went into a company and tried to get our product into there or if they had already [tried] to secure further orders, so basically knocking on doors and going and trying to get orders for our product. They were out soliciting orders, trying to find new business partners, end users or to resell and sell our product.

R. 113, Trial Transcript, PageID# 3727.

Maverick also called an expert witness, Robert Muenz, who testified that "solicited" means "everything you do to try to get the business. I mean it can go from phone calls to e-mails to tests, to Power Point presentations, to appointments, to follow-up. It's not anything specific.

10

It's just a general term that where we mean -- the way we interpret it is that it's everything that we have to do in order to get the business." *Id.* at 3694. Like Garrison, Muenz testified that the word has no other special meaning.

Worx, on the other hand, presented the testimony of an expert, Tyrone Burroughs, who explained that in the context of dealing with Wal-Mart, the word "solicited" takes on another meaning: an order is not solicited until Wal-Mart gives the vendor (who in this case is Worx) an item number and agrees on a price. Burroughs explained that getting a meeting with a Wal-Mart buyer and negotiating a price is just part of the process of developing a business relationship with Wal-Mart, and is not considered soliciting an order from Wal-Mart.

The district court interpreted the meaning of "orders solicited" based on Burroughs' testimony and made up the court's own five-part test that concluded that an order is not solicited from Wal-Mart unless five things happen: (1) the vendor received a supplier agreement, (2) there was product testing, (3) Wal-Mart and the vendor agreed on a price, (4) Wal-Mart gives the vendor an item number, and (5) Wal-Mart places an order. The court found that the first three requirements were met, but because Wal-Mart did not give Worx an item number or place an order until after Maverick's termination went into effect, Maverick had not solicited an order. The district court explained its ruling as follows:

> "Soliciting an order" as used in the Agreement does not mean merely "trying to get the business." Instead, the term means getting a specific request for the purchase of products which did not happen in this case until the standalone order was placed on July 31, 2009, after the expiration of the 120 day termination period.

R. 119, District Court's Factual Findings, PageID# 4264 (quotation marks in original).

III.

The district court erred because it interpreted the meaning of "orders solicited" based on testimony from Worx's expert, rather than based on its natural and ordinary meaning. Under Tennessee law, *i.e.*, the governing law here, the goal of courts when interpreting contracts "is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (internal quotation marks and citation omitted). The court's initial task in interpreting a contract is to determine whether its language is clear or ambiguous. *Id.* A contract is ambiguous if its meaning is uncertain and is "susceptible to more than one reasonable interpretation." *Id.* at 890. If a court finds that a contract's language is ambiguous, any ambiguity is to be strictly construed against the drafter, in this case Worx. *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968).

All of these principles—namely, that the words of a contract are to be given their natural and ordinary meaning and any ambiguity is construed against the drafter—are well settled; this is Contracts 101. The problem is that the district court did not follow these standards. Instead of giving the phrase "orders solicited" its ordinary meaning, the district court decided that the phrase was ambiguous and ordered a trial to try to figure out what it meant. Instead of construing this claimed ambiguity against Worx, the drafting party, the district court construed it against Maverick. And instead of trying to understand the intent of the parties, the district court relied on the testimony of a single expert witness—despite the testimony of all the other witnesses who testified to the contrary. All of this was error, and the district court's decision should be reversed on that basis.

The contract does not define "orders solicited," but that phrase is not ambiguous and should be given its ordinary meaning. *Black's Law Dictionary* provides the following definitions for the word "solicitation:" (1) "[t]he act or an instance of requesting or seeking to obtain something; a request or petition," and in the commercial context, (2) "[a]n attempt or effort to gain business." *Black's Law Dictionary* (10th ed. 2014). Merriam-Webster's online dictionary defines "solicit" as "to ask for (something, such as money or help) from people, companies, etc." http://www.merriam-webster.com/dictionary/soliciting (parenthesis in original). And the Oxford English dictionary defines "solicitation" as "[t]he action of soliciting, or seeking to obtain by earnest request; entreaty, petition, diligent or importunate asking." *OED Online, Oxford University Press*, June 2016.

All of those definitions share a commonality: they describe someone asking for something—such, for example, as someone (like Garrison) asking a business (like Wal-Mart) to start carrying a new product (like Worx's hand cleaner)—and this is exactly what the parties to the contract thought the phrase meant. Garrison explained at trial that he believed the word "solicited" meant "[t]rying to get the business," R. 114 at 3771, and even Worx's own vice president had a similar understanding of the phrase: "basically knocking on doors and going and trying to get orders for our product." R. 113 at 3727. The only alternative explanation for what the word "solicited" meant came from Burroughs, Worx's expert.

In reaching the conclusion that an order is solicited only after five steps are met—and, as a result, substituting the phrase "orders placed" for "orders solicited"—the district court disregarded the testimony of the parties as to their understanding of the phrase, which should have been of paramount importance in construing the parties' intent. Instead, on a question of language, the district court relied on the testimony of a retail consultant, who we can fairly infer

has no greater understanding or command of the English language than the actual parties to the agreement in question.

Moreover, even if the word "solicited" takes on another meaning when dealing with Wal-Mart—as Burroughs contended at trial—that is something that should have been put in the contract. Worx offered no evidence to suggest that Maverick had any idea it needed to satisfy some "five-part test"—which was entirely absent from the contract—in order to meet the contract standard of solicitation. And even if Garrison was an accomplished attorney—as the majority suggests he should have been (*see* Maj. Opn. at 7)—he never would have accepted the contract or expended the energy that he did with an understanding that successfully pitching a product to Wal-Mart could be so readily ignored despite the delivery of a perfect strike. Nor would any experienced businessman undertake the effort Garrison took knowing the risks posed by the interpretation given by today's majority.

The district court's reading of the phrase "orders solicited" also violates a basic principle of Tennessee contract interpretation that contractual provisions are not to be read in isolation from the purpose of the contract. *See Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012). The purpose of this contract was to give Maverick the opportunity to get in front of Wal-Mart—something that is not easy to do[2]—and pitch Worx's product. And Maverick did exactly that. Maverick used its connections to get in the door at Wal-Mart; spent several years in regular contact with Wal-Mart's buyers; made multiple trips to Wal-Mart's headquarters in Arkansas; put Worx's product in several different distribution centers for testing—and then was displaced at the eleventh hour, right before Worx received its first order from Wal-Mart. When one looks at this contract in the context of its objectives, it is obvious that the objectives here

---

[2] Burroughs, Worx's own expert, explained at trial that "depending on who you are, appointments [with Wal-Mart] sometimes can be difficult to get." R. 113 at 3630.

were accomplished. To underscore this latter point, one cannot help but notice the unseemly nature of the sequence of events. Imagine Garrison's outrage when he eventually learned of the timing of his termination, which was followed almost immediately by successfully concluding the negotiations and a contract announcement, and then—only three weeks after Maverick's termination went into effect—the placement of an order.

Finally, the issues in this case are relevant to several different marketing platforms. This same concept of midstream termination of a marketing contract arises in any number of other contexts, not just ones involving Wal-Mart. For example, this clearly arises in the context of real estate or other brokerage agreements, where the marketing efforts undertaken by a broker during the term of a listing frequently yield results after termination of a listing term. When considering our overall system of jurisprudence, we should not permit such an inequitable approach to commercial transactions become the law of the land. The district court's opinion, and this Court's affirmation, could now potentially be cited for any number of unjust violations of marketing or sales agreements.

IV.

The bottom line is that the district court erred when it determined that the contract was ambiguous, and the way it went about resolving that ambiguity was clearly erroneous. *See Planters Gin*, 78 S.W.3d at 889-90 (explaining that the issue of ambiguity is a legal question reviewed *de novo*, but its resolution of ambiguities is a factual question); Fed. R. Civ. P. 52(a)(6). Not only did the district court violate basic principles of contract law, it also held a trial where none was needed. Instead of holding a trial to determine the meaning of an unambiguous phrase—and then construing that phrase against the incorrect party—the district court should have read the contract for its ordinary and plain meaning, and against the backdrop

of its purpose. If the court had any further doubt, then it should have held a trial on whether Wal-Mart placed an order as a result of Maverick's efforts.

What is more, the district court should not have allowed expert testimony to develop the meaning of an unambiguous phrase into a triable issue. Even worse, the district court made up its own "five-part test" for what constituted the solicitation of an order, and then used that fiction as its basis for deciding the case. None of the parties to the contract—not even Burroughs— testified that an order is deemed "solicited" only after five steps are met. This is something the district court came up with on its own. The result of this case is an injustice, crafted in the ivory tower of those not adequately exposed to real-life business norms.

For all these reasons, the district court's decision should be reversed and remanded.