# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 21, 2013 Session[1]

## DOROTHY LAVON W. COLEMAN v. KEITH M. COLEMAN
(ShawnCoulson, LLP, Wheeler & Franks Law Firm, P.C.,
Movants in Fee Dispute)

**An Appeal from the Circuit Court for Shelby County**
**No. CT-000981-07    John R. McCarroll, Jr., Judge**

---

**No. W2012-02183-COA-R3-CV - Filed September 19, 2013**

---

This appeal arises from a proceeding to recover fees under an attorney's lien. The wife in the underlying Tennessee divorce action retained the appellant Washington, D.C. attorney to advise her on business issues related to the parties' largest marital asset, an international business. The attorney's engagement agreement gave the attorney a lien against any proceeds collected by the wife in the divorce and also provided for a monthly service charge on fee bills that were not paid when due. After considerable litigation, the divorce settled. After the settlement, the wife refused to pay the appellant attorney's outstanding fees. The attorney filed a motion in the divorce action to recover those fees under his attorney's lien. The wife objected to the attorney fees as excessive, unnecessary, and unreasonable. The trial judge in the divorce proceeding conducted an eight-day trial and ultimately held that the fees were reasonable and necessary to the attorney's representation of the wife. The trial court awarded the attorney damages, a service charge per the engagement agreement, and prejudgment interest, but it denied the attorney's request for the costs of collection. Both the wife and the attorney now appeal. Discerning no error, we affirm the trial court's decision in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., joined. J. STEVEN STAFFORD, J., filed a dissenting opinion.

---

[1]This case was assigned to Judge Kirby on July 26, 2013.

John J. Cook and Darrell N. Phillips, Memphis, Tennessee, for the Appellant, Dorothy Lavon W. Coleman

Jay S. Bowen and Will Parsons, Nashville, Tennessee, for the Appellee, ShawnCoulson, LLP

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background Facts

In April 1976, Plaintiff/Appellant Dorothy Lavon W. Coleman ("Wife") and Keith M. Coleman ("Husband") were married. They had three children during the marriage, all of whom have reached the age of majority.[2] In February 2007, after 30 years of marriage, Wife filed a petition for divorce on the grounds of inappropriate marital conduct and irreconcilable differences. Husband later filed a counter-complaint for divorce on the same grounds.

During their marriage, the parties were financially well-off and acquired many valuable assets. The most valuable of the marital assets was a multi-million dollar corporation called Mid-America Engine, Inc. ("MAE"). MAE sold large gas turbines and other generators to clients in the United States and also in the international community. Wife and Husband each held a 50% interest in MAE. Husband was the company's president, and Wife was its vice-president and secretary. Later, Wife was also named as the company's chief financial officer (CFO), although the position involved no additional responsibilities.

Over time, Wife began to mistrust Husband's management of the company they both owned. As discussed in more detail below, her mistrust of his management and the parties' disagreement over the valuation of MAE caused disputes which became serious issues in dividing this marital asset in the ensuing divorce.

---

[2]None of the issues involved in this appeal involve child-related matters.

**Retention of Wheeler & Franks and ShawnCoulson**

To commence the divorce litigation, Wife retained a family law attorney to represent her.[3] As the divorce proceedings got underway, Wife became concerned about the manner in which MAE's business was being conducted. Wife perceived that Husband was shutting her out of the operations of the business and denying her right to important company information. She was concerned that Husband was diverting millions of dollars out of MAE in order to diminish the value of the company in anticipation of the division of the marital assets in the divorce proceedings. Even more troubling, Wife harbored suspicions that Husband was involved in shady, perhaps even criminal, international business dealings.

To address these issues, Wife retained a Tupelo, Mississippi law firm that was recommended by her cousin. The Tupelo law firm, Wheeler & Franks Law Firm, P.C. ("Wheeler & Franks"), is comprised of attorneys Bill Wheeler and Jamie Franks. Wife hired Wheeler & Franks to manage the business aspects of the ongoing divorce litigation and to protect her interest in MAE. However, Messrs. Wheeler and Franks did not have experience in cases involving fraudulent or criminal activity at an international level, so they recommended to Wife that she consult with William Henry Shawn, an attorney with the law firm of Movant/Appellee ShawnCoulson, LLP ("ShawnCoulson"). ShawnCoulson has offices in Washington, D.C.; Brussels, Belgium; and London, England. Mr. Shawn practices out of ShawnCoulson's D.C. office and has extensive experience in legal matters involving international business.

On November 6, 2008, Wife had an initial meeting with Mr. Wheeler, Mr. Franks, and Mr. Shawn at her home to discuss her case. In particular, Wife wanted to learn about Mr. Shawn's practice and his experience in international business. She told Mr. Shawn that she suspected that Husband was engaged "in a lot of unlawful or questionable activities," particularly with respect to MAE business conducted in Russia, Croatia, and the Balkans. She suggested to the lawyers that Husband may have created fictitious entities as vehicles for diverting millions of dollars out of MAE in order to diminish the value of MAE for purposes of the divorce litigation. Wife told Mr. Shawn that she wanted to "acquire control of MAE so she could stop

---

[3]Over the course of the divorce litigation, Wife was represented by several family-law attorneys. Stevan Black was Wife's initial counsel and filed the divorce complaint on her behalf. In August 2008, Mr. Black was granted leave to withdraw, and C. Suzanne Landers filed a notice of appearance in the trial court. In December 2008, Ms. Landers was allowed to withdraw, and Mitch Moskovitz and Mary Morgan Whitfield filed a notice of appearance. In September 2009, Mr. Moskovitz and Ms. Whitfield were granted leave to withdraw from their representation of Wife. In February 2010, Stuart Breakstone and Kathy Tennison filed a notice of appearance. In August 2011, Mr. Breakstone and Ms. Tennison were allowed to withdraw from the case. In late July 2011, Timothy R. Johnson, of the law firm Pietrangelo Cook, filed a notice of appearance on behalf of Wife. Lawyers from that law firm represent Wife in this appeal.

[Husband's] activities, and . . . also, prevent the looting or destruction of the company in the meantime." Mr. Shawn advised Wife that "she had a potential derivative action and that would probably be the best vehicle for her to acquire control [of MAE] and in the process to be able to eject [corporate counsel for MAE] and to stop the looting of the company."

Mr. Wheeler and Mr. Franks strongly endorsed Mr. Shawn as the right attorney to help Wife deal with the most pressing legal issues related to MAE. They told Wife that she would benefit greatly from Mr. Shawn's expertise and experience with international business laws, the Foreign Corrupt Practices Act ("FCPA"), and terrorism laws. They emphasized that Mr. Shawn was familiar with money laundering schemes and "all of those issues" with which Wife would need to deal. They described Mr. Shawn as "a much older, more experienced lawyer." They told Wife: "He's been in Washington dealing with these types of issues for several decades and has offices in London, Brussels, contacts throughout Europe, and, of course, he had worked in one of the agencies in Washington early in his career . . . ." For the referral, ShawnCoulson agreed to pay Wheeler & Franks a referral fee of 10% of ShawnCoulson's receipts from Wife. Mr. Shawn orally informed Wife of this referral fee but did not put the information in writing to her.[4]

At the November 6 meeting, Wife retained Mr. Shawn to handle issues surrounding MAE, including a possible shareholder derivative lawsuit, Husband's potential criminal liability as well as her own, and any fraud or other malfeasance committed by Husband in connection with MAE. Wife specifically instructed Mr. Shawn to "move fast." She especially wanted fast action with respect to the derivative lawsuit; they set a two-week deadline for Mr. Shawn to produce a draft complaint for such a lawsuit.

Two weeks after he was retained, Mr. Shawn traveled to Memphis, Tennessee, to meet with Wife to discuss her increasingly complex legal issues. The meeting occurred at the office of Wife's family law attorney at the time, Suzanne Landers; Mr. Wheeler and Mr. Franks were also present. At that meeting, Mr. Shawn presented Wife with a four-page engagement agreement letter describing the scope of his firm's representation and the fees to be charged. The agreement explains ShawnCoulson's billing practices, lists the hourly rates for partners, associates, paralegals (between $95 and $195 per hour), and clerical personnel, and it specifies that Mr. Shawn's rate "is $575 per hour." The agreement also provides for a 1.5% monthly service charge in the event of non-payment: "We expect immediate payment on all [monthly] invoices and we will impose a service charge of one and one-half (1-1/2) percent, per month, on any balance due remaining after 30 days after the invoice date."

---

[4]Wife denied that Mr. Shawn told her about the referral fee, but the trial court ultimately credited the testimony of Mr. Shawn, Mr. Wheeler, and Mr. Franks, all of whom said that Wife was told about the referral fee.

The engagement agreement also includes a provision addressing disputes that might arise between the firm and Wife. It states that any such disputes "shall be governed by the laws of the District of Columbia, except its conflicts of laws," and that "any such disputes, including the validity of this arbitration requirement, shall be submitted to binding arbitration in Washington, D.C., before and under the rules of the National Arbitration Forum . . . ." The agreement permitted ShawnCoulson to recover "reasonable costs and attorneys' fees" if it had to initiate arbitration proceedings in order to enforce the agreement.

The engagement agreement also includes a provision granting ShawnCoulson an attorney's lien on any recovery Wife might obtain, in order to ensure the collection of ShawnCoulson's attorney fees under the agreement: "If any matter for which you engage us includes any monetary recovery, you agree to provide us with a lien on such recovery for accrued fees and costs . . . ."

Wife signed the engagement agreement in the presence of Mr. Shawn, Mr. Wheeler, and Mr. Franks. She paid ShawnCoulson a $100,000 retainer as set forth in the agreement. Mr. Shawn told Wife that she had a right to have independent counsel review the agreement before she signed it, but she declined to do so. Mr. Shawn also asked Wife if she had any questions, but she had none.

Upon the signing of the engagement agreement, Mr. Shawn swung into action as part of Wife's team of lawyers, which was comprised of her primary divorce counsel (which changed throughout the proceedings), Mr. Wheeler, Mr. Franks, and now Mr. Shawn.[5] Mr. Shawn opened three to five different files for Wife's case in order to account separately for the work done on each matter. The billing records for all months during ShawnCoulson's representation of Wife are extremely detailed and identify the tasks and work done on each case project.

One of the primary files opened by Mr. Shawn related to the contemplated shareholder derivative lawsuit. By December 2008, Mr. Shawn had finalized a draft complaint for the derivative lawsuit and had transmitted it to MAE's corporate counsel, Jeff Germany. For months before that, Mr. Germany had refused all of Wife's requests for documentation. However, after he received the draft complaint, Mr. Germany contacted Mr. Shawn and gave him access to MAE's books and records. In general, after Mr. Shawn sent the derivative action complaint to Mr. Germany, Wife's team "got a measure of cooperation immediately."

---

[5]In describing the events that led to the instant appeal, we will refrain from detailing each task performed by Mr. Shawn and the members of his law firm in the course of representing Wife, but will instead highlight only significant matters.

After he reviewed the MAE records Mr. Germany sent, Mr. Shawn became concerned about criminal activities associated with MAE's international business. Mr. Shawn concluded that a forensic audit of MAE was needed to track the proceeds of certain intricate foreign transactions. After he informed Wife of this conclusion, Mr. Shawn contacted a large accounting firm, Deloitte, about performing such a forensic audit on MAE.

On February 27, 2009, the trial court entered a consent order in the divorce proceedings appointing a Special Master, G. Patrick Arnoult. The order directed Mr. Arnoult "to serve as Special Master of the disputes between the parties and their business interests in [MAE]." Mr. Shawn considered the appointment of a Special Master to be a breakthrough for Wife in the divorce action. At Mr. Shawn's suggestion, the Special Master agreed to retain Deloitte to conduct a forensic audit of MAE.[6] After that, the forensic audit was commenced.

Meanwhile, Mr. Shawn had acquired more detailed information about MAE's business transactions. In light of what he had learned, Mr. Shawn advised Wife against filing a derivative lawsuit. He reasoned that such a lawsuit would be problematic because MAE "was just a cobweb of all kinds of intrigue and all kinds of potential liability that [Wife and her legal team] had no control over." Mr. Shawn advised Wife that she should not retain an ownership interest in MAE because of the possibility of inheriting criminal liability. Mr. Shawn also indicated that litigating a derivative lawsuit would cost Wife millions of dollars and, even if she prevailed, there might be nothing left. In the alternative, Mr. Shawn advised Wife to set up her own company and helped her do so. However, in his communications to Husband, Mr. Shawn continued to threaten to file the derivative lawsuit and to encourage a forensic audit, for the purpose of putting pressure on Husband to make a reasonable settlement offer to Wife. Mr. Shawn said that Wife's legal team "agreed wholeheartedly with that approach."

In February 2009, Wife sent Mr. Shawn a handwritten note of appreciation. The note told Mr. Shawn that he and "all my legal team" were "a life saver to me. My kids tell me they see me getting better weekly. I attribute this to you all standing between [Husband] and [Mr. Germany] and me, not allowing [them] to ABUSE me as they have for the past three years."

In early March 2009, for the first time in the parties' divorce litigation, Husband presented Wife with a settlement offer. The settlement proposal was in the form of an offer of judgment, made pursuant to Rule 68 of the Tennessee Rules of Civil Procedure, of approximately $12 million. Wife's legal team unanimously recommended that she reject that offer, even though rejecting it put Wife at risk for having to pay the costs of the litigation, as

---

[6]Choosing a forensic auditor in and of itself proved to be a contentious matter. Husband suggested other auditing firms, but Deloitte was ultimately chosen upon the urging of Mr. Shawn.

per Rule 68. *See* Tenn. R. Civ. P. 68. After that, Wife's legal team continued to represent her interests in the ongoing divorce litigation. As part of the team's overall strategy, Mr. Shawn continued to work on the threatened shareholder derivative lawsuit, made arrangements for the forensic audit of MAE, set up meetings for Wife with compliance officials, reviewed thousands of MAE-related documents provided by Husband, and researched issues related to Wife's potential criminal liability.

On April 23, 2009, Mr. Shawn sent Wife a comprehensive letter summarizing his overall strategy to protect her from criminal liability, minimize her legal fees, and maximize her eventual share of the marital estate in the divorce. Addressing Wife's assertion that her financial resources were dwindling, Mr. Shawn recommended working toward a settlement with Husband. In this way, Mr. Shawn advised, Wife would be protected from civil or criminal liability, save legal fees, and be able to move on with her life. To this end, Mr. Shawn recommended that Wife initiate mediation.

Around this time, Wife sent ShawnCoulson a check as payment toward her outstanding fee balance of $116,350.56. The check bounced. When Mr. Shawn told Wife that her check to him had bounced, she explained that she was having trouble getting funds out of MAE. Mr. Shawn assured Wife that, notwithstanding the bounced check, he and his firm would "stick with" her and continue to represent her.

By May 2009, the Special Master had terminated Mr. Germany from his employment as general counsel for MAE and had appointed attorney Paul Matthews to the post. During this period, Mr. Shawn advised Wife against self-reporting to the Justice Department and the Internal Revenue Service her suspicions of criminal activity by Husband and MAE. He told Wife that, if she decided to self-report, she would need to hire a criminal attorney to represent her.[7]

In August 2009, Husband and Wife engaged in three-day mediation of all of their disputes. Mr. Shawn did not participate in the mediation. As a result of the mediation, the parties reached an agreement, which was put in the form of a proposed Marital Dissolution Agreement (MDA). Mr. Shawn reviewed the proposed MDA for Wife. He suggested that the MDA include a provision to allow Wife to pursue hidden assets that Husband did not divulge before the mediation, as well as a provision permitting Wife to collect costs from Husband if her pursuit of hidden assets proved successful. Mr. Shawn also suggested that the MDA include a provision that Husband would indemnify Wife in the event that MAE's business dealings resulted in a criminal prosecution of Wife.

---

[7]Wife never hired a criminal attorney.

In the settlement to which Husband and Wife finally agreed, Wife received significantly more than Husband had previously offered. The settlement required Husband to pay Wife $16,950,000 in cash and for her to receive parcels of real property, automobiles, and other pieces of valuable personal property. All told, Wife was to receive approximately $37 million in assets from the divorce settlement.

Soon after the parties finalized the settlement, Wife began to express her dissatisfaction with it and repudiate the terms of the MDA. Wife's dissatisfaction in part took the form of lodging several complaints against her legal team. This prompted Mr. Shawn to terminate ShawnCoulson's representation of Wife. At that time, it was alleged that Wife owed ShawnCoulson over $180,000 in legal fees. Wheeler & Franks also terminated its relationship with Wife at this time, and the trial court permitted Wheeler & Franks to withdraw from representing her in the divorce proceedings.

On September 18, 2009, Wife sent Mr. Shawn an email stating: "As you know, I have no more $$ to pay legal fees. You know I think you are brilliant and have the utmost respect for you; however, I think all my teams [sic] realizes, at this point I am highly disappointed in the outcome of this case." Mr. Shawn sent Wife a responsive email, explaining to her how his firm's efforts led to a favorable settlement and simultaneously protected Wife from criminal liability. Mr. Shawn's response urged Wife to accept the terms of the MDA to which she had agreed and move on with her life. In reply, Wife told Mr. Shawn that she fully understood and respected his position, and said that she would "attempt to sell what assets I am free to sell in order to meet my obligations toward my legal fees."

In November 2009, Husband made an initial $4.2 million payment to Wife. Despite receiving this payment from Husband, Wife did not pay ShawnCoulson the balance due on her attorney fee bill.

Wife continued to repudiate the terms of the MDA. On September 22, 2009, Husband filed a petition in the trial court below to enforce the MDA. In December 2009, the trial court conducted a hearing on Husband's petition. After the hearing, the trial court held that the MDA was an enforceable agreement, binding on both parties. On April 12, 2010, the trial court entered a final decree of divorce that incorporated by reference the parties' MDA. Around that time, Husband tendered to the clerk of the trial court the sum of $4,295,000 as an installment payment toward his purchase of Wife's interest in MAE; the trial court ordered the money held by the clerk pending further order of the court.

## Attorney's Lien

Meanwhile, on October 30, 2009, ShawnCoulson filed with the trial court below a "Motion to Perfect and Enforce Attorney Lien," pursuant to Tennessee Code Annotated §23-2-103.[8] Attached to the motion was the engagement agreement between ShawnCoulson and Wife as well as a "Notice of Attorney Lien on Right of Action and Affidavit of Attorney." ShawnCoulson asked the trial court to award it a judgment for outstanding attorney fees and expenses of $116,840.22, incurred as of October 28, 2009, plus the expense incurred in filing the motion.

On April 14, 2010, two days after the final decree was entered, ShawnCoulson and Wheeler & Franks filed a joint "Petition to Enforce Attorney Liens and for Expedited Status Conference." The law firms asserted in their petition that, as of February 28, 2010, Wife owed ShawnCoulson $121,928.58 and Wheeler & Franks $196.834.58 in unpaid legal fees.

In September 2010, ShawnCoulson attempted to initiate arbitration, as provided in the engagement agreement. However, the arbitration organization specified in the agreement, The National Arbitration Forum, would not take the case. Under the circumstances, Wife would not consent to arbitration, and ShawnCoulson did not take any further action to enforce the arbitration provision.[9]

On May 6, 2011, the attorney who represented both Wheeler & Franks and ShawnCoulson filed motions to withdraw from representing those law firms. The next week, Wheeler & Franks and ShawnCoulson each retained new, separate counsel.

On May 19, 2011, ShawnCoulson filed a "Notice of Amended and Supplemental Attorney Lien on Right of Action and Affidavit of Attorney." ShawnCoulson sought a lien in the

---

[8]That statute provides:

> Any attorney or solicitor who is employed to prosecute a suit that has already been brought in any court of record shall have a lien upon the plaintiff's right of action from the date of the attorney's or solicitor's employment in the case; provided, that the record of the case shall first be made to show such employment by notice upon the rule docket of such court, by a written memorandum filed with the papers in the case or by notice served upon the defendant in the case.

Tenn. Code Ann. § 23-2-103 (2009).

[9]Neither party has raised on appeal the issue of whether the parties were required to arbitrate their dispute.

amount of its "past due attorneys' fees and costs of $240,203.15," plus an accruing service charge of 1.5% per month on the unpaid balance as of April 30, 2011. Wheeler & Franks also filed a notice of attorney's lien in the amount of $232,353.

On August 15, 2011, Wife filed a "Response to and, in the Alternative, Motion to Dissolve Attorney's Lien and Request for Declaratory Judgment for Return of Excessive Fees Already Paid by [Wife]."[10] She claimed that, in the course of representing her, Wheeler & Franks had billed her over $600,000, and ShawnCoulson had billed her over $650,000 in fees. She alleged that the attorneys' "hourly rates were unreasonable, grossly exceeding the then prevailing rate for Shelby County, considering their reputation and lack of experience and expertise in the local Memphis legal market." She also claimed that "a close inspection of billing records of the Movants evidence[s] that the fees charged and paid were excessive and unreasonable."

To resolve this dispute, the trial court commenced a trial. The trial ended up taking eight days and was held on non-consecutive days: September 7 and 8, 2011, November 14, 15, 16, and 17, 2011, and January 4 and 5, 2012. The main issue at trial was whether the attorney fees claimed by Wheeler & Franks and ShawnCoulson (collectively referred to as "Movants") were reasonable and necessary. The trial court admitted into evidence 93 exhibits, including voluminous billing records and correspondence between the parties regarding the work performed and the attorney fees charged.

The Movants' proof included testimony by Mr. Wheeler, Mr. Franks, and Mr. Shawn. They presented detailed billing records and explained the work described in those records.

In his testimony, Mr. Shawn described at length his representation of Wife. He said that he was never admitted to practice before the trial court *pro hac vice* and never appeared in court. Still, because of his experience and expertise, Wife and her legal team relied on Mr. Shawn to develop strategies for negotiating with Husband and investigating his deceptive practices without exposing Wife to civil or criminal liability. Mr. Shawn said that Wife instructed him to proceed with the shareholder derivative lawsuit immediately because Husband was shutting Wife off from MAE and preventing her from obtaining any documents on the company's ongoing dealings. He then explained that he reconsidered that course of action when he eventually discovered the details of Husband's questionable business deals. Mr. Shawn testified about the time and effort he expended representing Wife during each month as the case progressed from November 2008 through September 2010.

---

[10]On September 1, 2011, Wife filed an "Amended Counter-Petition on Motion to Dissolve Attorney's Lien and for Declaratory Judgment for Return of Excessive Fees," seeking to "clarify the damages and relief sought . . . from the Movants . . . ."

The evidence showed that ShawnCoulson billed Wife for just over 1,000 hours of work, for a total of just over $450,000, during the firm's representation of her. In his testimony, Mr. Shawn explained the reasons behind the many hours billed for research, consultation, and troubleshooting designed to protect Wife from potential criminal or other liability while at the same time obtaining an accurate valuation of the company. He testified that his paralegal did most of the legal research, and the bills reflected that fact.

Mr. Shawn testified about specific MAE business deals that he investigated for Wife that he ultimately determined were troublesome — for example, the Gazprom deal, the "Croatian issue," the "Nigerian issue," and the "Jordanian issue." Mr. Shawn and his paralegal spent hours reviewing boxes of documents and thousands of emails found on Husband's computer, all in order to discover and decipher Husband's dubious business dealings. Mr. Shawn explained that he sought to straddle an uncertain line; he wanted Wife to receive her due share of MAE in the divorce, but if they exposed Husband's questionable business dealings, it could result in the ruination of the company and a Pyrrhic victory for Wife. After much research and consideration, Mr. Shawn recommended to Wife that she distance herself from MAE and begin her own business. To help Wife do so, Mr. Shawn facilitated some international connections to support her efforts to establish a new business.

Mr. Shawn did not participate in Wife's mediation, and his billing reflected this. After the mediation, he reviewed the proposed MDA and made suggestions to afford Wife a remedy in the event that she later discovered assets that Husband had managed to keep hidden.

Mr. Shawn testified that he and his law firm continued to represent Wife even after the check she gave them to pay her fees bounced. When it became apparent that Wife did not intend to pay the fees she owed, Mr. Shawn attempted to initiate arbitration. When that effort failed, he initiated the proceedings in the trial court to execute on his contractual attorney's lien.

Wife also testified at trial. She said that she was dissatisfied with how her case was handled and felt that the fees charged by the attorneys were excessive. Wife maintained that she initially contacted Wheeler & Franks because she "needed a corporate attorney." She recalled meeting with Mr. Wheeler, Mr. Franks, and Mr. Shawn at her home in November 2008, but she did not recall meeting with them again in Ms. Landers' office two weeks later. Wife acknowledged that she signed the engagement letter with ShawnCoulson, but recalled that she did so in her own home, not in Ms. Landers' office. Wife professed that she "did not, in any way, know that I was going to get an entire team of lawyers." Contrary to Mr. Wheeler's testimony, Wife did not recall asking Mr. Wheeler to be the "quarterback" of her team of corporate counsel. In Wife's description of her meetings with her attorneys in Memphis, she claimed that the attorneys frequently drifted off topic to discuss basketball, work on their computers, or do other things; she did not understand why all of her attorneys met together.

-11-

Again contrary to Mr. Wheeler's testimony, Wife said that she did not recall insisting that all of her attorneys attend these meetings. Instead, she recalled saying to Mr. Wheeler and Mr. Franks, "Please, only one of you come" to the meetings, in order to save on fees.

Wife testified that she told Mr. Wheeler that she was sacrificing personal funds and selling personal assets in order to pay her attorneys, and that her attorneys were aware that her funds were running out. She said she told Mr. Wheeler that she was concerned about the amount Mr. Shawn was charging her, and claimed that Mr. Wheeler assured her that he would mention the issue to Mr. Shawn. Wife denied that anyone told her that ShawnCoulson was going to pay a 10% referral fee to Wheeler & Franks and asserted that she never would have hired Mr. Shawn had she known about the referral fee.

Before meeting with Mr. Wheeler and Mr. Franks, Wife said, she had no interest in filing a shareholder derivative lawsuit. She said that she expected her attorneys to get her a proper valuation of MAE for purposes of the divorce mediation, but she never received one. She estimated that, had they accounted for the value of the assets Husband had hidden, the true value of MAE would have been somewhere between $300 and $400 million at the time of the mediation. Wife said, "We were doing 85 million dollars a year, and there was about 50 million dollars in the bank account for the past two years." For this reason, Wife was disappointed that she received only about $37 million as her share of the marital estate.

Wife testified that in the beginning she was satisfied with her attorneys but later became frustrated by them. She complained that her attorneys did not investigate the suspicious business deals that she asked them to investigate and then did "absolutely nothing" to prepare her for the divorce mediation.

To support his claim for attorney fees, Mr. Shawn submitted the testimony of two attorney expert witnesses, Carol Elder Bruce and Randall D. Noel. Ms. Bruce is an experienced lawyer who has practiced in the Washington, D.C. area for over 35 years. In the past, Ms. Bruce worked in the D.C. United States Attorney's Office for a number of years. During her time in the D.C. U.S. Attorney's Office, she served in the Major Crimes Division and the Fraud Division and had been lead counsel in over 115 jury trials. After reviewing the documents involved in Wife's case and interviewing Mr. Shawn, Ms. Bruce concluded that Mr. Shawn's attorney fees were reasonable and necessary to the representation of Wife under the standard set out in *Alexander v. Inman*, 974 S.W.2d 689, 695 (Tenn. 1998), and Rule 1.5 of the D.C. and Tennessee Rules of Professional conduct. Ms. Bruce felt wholeheartedly that Mr. Shawn acted prudently in all of his choices on Wife's behalf and in all of the hours Mr. Shawn spent reading, researching, traveling, and consulting with Wife and the other members of her legal team. Ms. Bruce indicated in her testimony that the prospect of criminal exposure to Wife was very serious, and that Mr. Shawn used good judgment in focusing on

protecting her from being held civilly or criminally liable for Husband's business transactions. Ms. Bruce said that Mr. Shawn's fee rate of $575 to $595 per hour was within reasonable limits; she noted that attorneys in large D.C. firms frequently charge at least $750 per hour.

Ms. Bruce also testified about the service fee set forth in the ShawnCoulson engagement agreement. She said that assessing a 1.5% service charge for late-paid fees is ethical, so long as the assessment is included as a provision in the attorney's engagement letter with the client. She testified that the service charge in ShawnCoulson's agreement, amounting to an annual rate of 18%, is well within the D.C. legal limit of 24%.

Randall Noel, Mr. Shawn's other expert, is a highly experienced commercial litigation attorney practicing in Memphis, Tennessee. Mr. Noel testified that Mr. Shawn's hourly rate of $575 to $595 was fair and reasonable considering his relevant expertise and experience in international business, the FCPA, international bribery laws, and anti-money laundering laws. He stated that some attorneys in Shelby County, Tennessee, charge as much as $500 per hour for sophisticated and complex commercial litigation work. In his testimony, Mr. Noel acknowledged that there were at least three well-known and respected attorneys with some international business experience in Memphis.

To rebut Mr. Shawn's expert testimony, Wife offered the testimony of attorney Caren Nichol, an experienced family law attorney in Memphis, Tennessee. Wife offered Ms. Nichol's testimony to show that some of the work for which the Movants charged was either duplicative or unnecessary. Based on Ms. Nichol's review of the attorney fee bills, Wife submitted a "revised" billing statement. The revised bill omitted the tasks that Ms. Nichol deemed duplicative for Mr. Wheeler, Mr. Franks, and Mr. Shawn, lowered their hourly rates to an hourly rate she felt was reasonable, and thereby came up with a total fee that she believed was reasonable. Ms. Nichol admitted that she had no experience in the area of international law. She expressed the opinion that it was unreasonable for ShawnCoulson to charge Wife a total of $650,000, but later in her testimony acknowledged that the total amount of fees ShawnCoulson actually charged was $450,000. Ms. Nichol explained that she "did look through the bills, but did not add them up." Ms. Nichol was critical of the Movants' time spent evaluating and working on a shareholder derivative lawsuit that was never filed. She conceded, however, that she did not review the derivative action complaint and did not know whether or when the draft complaint was provided to Husband. Ms. Nichol criticized the Movants for persuading the Special Master to hire a forensic accountant without ever obtaining a valuation of MAE, but later conceded that a forensic audit and a valuation are separate endeavors and that Deloitte was not hired to perform a valuation. Ms. Nichol conceded that she was inadvertently under the mistaken impression that Wife was charged attorney fees in a matter known as the "Surplus Source" file, when those fees were actually paid by MAE.

This concluded the proof submitted to the trial court. At the conclusion of the proof, the trial court gave counsel for the parties an opportunity to submit proposed findings of fact and conclusions of law.

On July 2, 2012, the trial court entered two separate orders entitled "Findings of Fact and Conclusions of Law," one with respect to ShawnCoulson and the other with respect to Wheeler & Franks. The trial court's 55-page findings of fact and conclusions of law as to ShawnCoulson are thorough, detailed, and annotated to the proof in the record. The trial court granted ShawnCoulson the relief the firm requested on its attorney's lien but denied its request for an award for the costs of collection. The trial court awarded ShawnCoulson $111,885.38 for past-due attorney fees, plus $22,896.08 in prejudgment interest from October 30, 2009 to June 30, 2012, plus $71,643.06 for the 1.5% service charge under the agreement from October 30, 2009 to June 30, 2012. As to the order that related to Wheeler & Franks, the trial court denied in part the relief requested, holding that $191,065 of the fees charged by Wheeler & Franks must be forfeited because certain of the fees were duplicative and unnecessary.

On August 10 and August 20, 2012, respectively, the trial court entered two separate judgments, one for ShawnCoulson and one for Wheeler & Franks. The order as to ShawnCoulson incorporated by reference the trial court's findings of fact and conclusions of law entered on July 2. The trial court then certified the orders as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Wife appealed both orders, and ShawnCoulson appealed the order denying its request for the costs of collection. Wife later dismissed her appeal as to Wheeler & Franks, and that law firm is not a party to this appeal.[11] We are now presented with only Wife's appeal of the order granting relief to ShawnCoulson and ShawnCoulson's cross-appeal of that same order.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Wife raises the following issues:

> (1) Whether the trial court erred in finding that all of ShawnCoulson's fees were reasonable?
>
> (2) Whether the trial court erred in awarding pre-judgment interest to ShawnCoulson?
>
> (3) Whether the trial court erred in awarding ShawnCoulson a 1.5% "service charge"?

---

[11]The parties indicated that Wife settled her dispute with Wheeler & Franks out of court.

ShawnCoulson raises one issue in its cross-appeal:

(4) Whether the trial court erred in declining to award ShawnCoulson its costs of collection?

We review the trial court's determination regarding the reasonableness of an attorney fee for an abuse of discretion. A trial court's determination on the reasonableness of fees is "a subjective judgment based on evidence and the experience of the trier of facts"; there is "no fixed mathematical rule" for determining what a reasonable fee is. **Wright ex rel. Wright v. Wright**, 337 S.W.3d 166, 176 (Tenn. 2011) (quoting **United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co.**, 703 S.W.2d 133, 137 (Tenn. 1986), and **Killingsworth v. Ted Russell Ford, Inc.**, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002)). On appeal, "[w]e presume that the trial court's discretionary decision is correct, and we consider the evidence in a light most favorable to the decision." **Id.** "[W]e will find an abuse of discretion only if the court 'applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party.'" **Id.** (quoting **Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.**, 249 S.W.3d 346, 358 (Tenn. 2008), and citing **Lee Med., Inc. v. Beecher**, 312 S.W.3d 515, 524 (Tenn. 2010)).

Similarly, a trial court's decision to award prejudgment interest pursuant to Tennessee Code Annotated § 47-14-123 is a matter within the trial court's sound discretion.[12] **Alexander**, 974 S.W.2d at 698. Therefore, we will reverse a trial court's decision to award or deny prejudgment interest "only upon a finding of a 'manifest and palpable abuse of discretion.' Under this deferential standard, an appellate court may not substitute its judgment for that of the trial court. Rather, an abuse of discretion occurs only when the evidence does not support the trial court's decision." **Id.** (quoting **Myint v. Allstate Ins. Co.**, 970 S.W.2d 920, 927 (Tenn. 1998)).

The trial court below was presented with considerable evidence, much of which consisted of conflicting testimony. The trial court had the opportunity to see the witnesses and view their demeanor as they testified. For this reason, "[t]he weight, faith, and credit to be given to a witness's testimony lies in the first instance with the trial court as the trier of fact, and the credibility accorded will be given great weight on appeal." **McDonnell Dyer, P.L.C. v. Select-O-Hits, Inc.**, No. W2000-00044-COA-R3-CV, 2001 WL 400386, at *8 (Tenn. Ct. App. Apr. 20, 2001). The weight accorded to expert testimony is also entrusted to the trier

---

[12]Under that statute, "prejudgment interest, *i.e.*, interest as an element of, or in the nature of, damages, . . . may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . ." Tenn. Code Ann. § 47-14-123 (2001).

of fact. *See Mc.Daniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). We refrain from second-guessing the factual findings that were based on the trial court's credibility determinations unless clear and convincing evidence demonstrates error. *Id.*; *see also Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Wife also challenges the enforceability of the service charge provision in the parties' engagement agreement. Issues related to the interpretation of a contract are questions of law, subject to *de novo* review. *Perkins v. Metro. Gov't of Nashville & Davidson County*, 380 S.W.3d 73, 80 (Tenn. 2012); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000); *see also Matlock v. Rourk*, No. M2009-01109-COA-R3-CV, 2010 WL 2836638, at *3 (Tenn. Ct. App. July 20, 2010) ("Whether or not a contract is enforceable is a question of law, which we review *de novo*, with no presumption of correctness accorded to the decision of the court below.")

On cross-appeal, ShawnCoulson argues that the trial court erred in its interpretation of the provision in the engagement agreement on ShawnCoulson's costs of collecting on the attorney's lien. This issue also involves interpretation of the parties' contract, a question of law that is reviewed *de novo*, with no presumption of correctness. *Perkins*, 380 S.W.3d at 80; *Doe*, 46 S.W.3d at 196; *Angus*, 48 S.W.3d at 730.

## ANALYSIS

### Trial Court Subject Matter Jurisdiction

At oral argument in this cause, this Court *sua sponte* raised the issue of the trial court's subject matter jurisdiction over the issue of ShawnCoulson's attorney's lien, in view of the fact that Mr. Shawn never sought admission *pro hac vice* in the trial court below. Rule 13(b) of the Tennessee Rules of Appellate Procedure provides that appellate review "generally will extend only to those issues presented for review." It adds, however, that the appellate court is to "also consider whether the trial court and the appellate court have jurisdiction over the subject matter, whether or not presented for review." Tenn. R. App. P. 13(b). "Whether a court has subject matter jurisdiction over a case is a question of law that we review *de novo* with no presumption of correctness." *Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 602 (Tenn. 2013) (citing *Word v. Metro Air Servs., Inc.*, 377 S.W.3d 671, 674 (Tenn. 2012) (citing *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000))); *see also McQuade v. McQuade*, No. M2010-00069-COA-R3-CV, 2010 WL 4940386, at *4 (Tenn. Ct. App. Nov. 30, 2010) (citing *Button v. Waite*, 208 S.W.3d 366, 369 (Tenn. 2006)).

After oral argument, this Court directed the parties to file supplemental briefs regarding the trial court's subject matter jurisdiction, particularly in light of ***Castle v. David Dorris Logging***, No. W2012-00917-COA-R3-CV, 2013 WL 500780 (Tenn. Ct. App. 2013), and the cases cited therein. We considered this issue on appeal after we received the parties' supplemental briefs.

After reviewing the parties' briefs, we are satisfied that the trial court below had subject matter jurisdiction to adjudicate ShawnCoulson's attorney's lien. The issue regarding ShawnCoulson's compliance with the rules governing out-of-state attorneys goes to the declaration of the attorney's lien, an issue over which the trial court clearly had subject matter jurisdiction. ***See Starks v. Browning,*** 20 S.W.3d 645, 654 (Tenn. Ct. App. 1999) (affirming the portion of the trial court's order that imposed a lien on the proceeds).

Furthermore, Wife agreed by contract to give ShawnCoulson an enforceable charging lien. She knew at the time she signed the engagement agreement that ShawnCoulson is a Washington, D.C. law firm, and that Mr. Shawn is licensed in D.C.; nothing in the engagement letter makes her agreement to the charging lien contingent on ShawnCoulson obtaining *pro hac vice* admission to the Tennessee bar. Wife cannot now be heard to argue that the attorney's lien to which she agreed is not valid and enforceable simply because Mr. Shawn was not admitted *pro hac vice* in the trial court below.

Thus, the fact that Mr. Shawn did not seek admission *pro hac vice* in the trial court did not deprive the trial court of subject matter jurisdiction to consider ShawnCoulson's attorney's lien, voluntarily given, and likewise did not affect the enforceability of ShawnCoulson's attorney's lien. We go on to consider the issues raised on appeal by the parties.

### Reasonableness of ShawnCoulson's Attorney Fees

The Tennessee Supreme Court has held that "an attorney is entitled to compensation in the amount agreed upon by contract, provided that the contract is fair at its inception and entered into in good faith." ***Alexander***, 974 S.W.2d at 694. Good faith and fairness can be established by an attorney who seeks to enforce an attorney fee agreement by showing that (1) the client fully understood the contract's meaning and effect, (2) the attorney and the client shared the same understanding of the contract, and (3) the terms of the contract are just and reasonable. ***Id.***

On appeal, Wife argues that ShawnCoulson failed to establish the third element, that the terms of her contract and the fees ultimately charged were just and reasonable. In determining whether an attorney's fee is reasonable, a trial court must consider the non-exclusive factors enumerated in Rule 1.5(a) of the Tennessee Rules of Professional Conduct:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a);[13] *see Conners v. Conners*, 594 S.W.2d 672, 676 (Tenn. 1980) (considering factors similar to those stated in Rule 1.5(a)).

In its in-depth opinion, the trial court held that ShawnCoulson is entitled to the fees charged under the engagement agreement because the agreement was "fair at its inception and entered into in good faith." This conclusion is well-supported by the trial court's findings as to the underlying facts. We outline below the underlying facts found by the trial court and the stated reasons for its decision.

---

[13]Effective January 1, 2011, RPC 1.5 was amended to add preliminary language prohibiting any agreement, charge, or collection of an unreasonable fee or expense amount, but the factors for determining a reasonable fee listed in subpart (a)(1) – (10) remained the same. In addition, the amendment added a comment clarifying that the stated factors are not exclusive and each factor may not be relevant in every case. *See Wright*, 337 S.W.3d at 177 n.17 (explaining amendment).

### (1) Wife understood the terms of the engagement agreement

The trial court found that Wife's engagement agreement is clear as to its terms. The agreement outlines the applicable hourly rates, states that "immediate payment" is required, and states that Wife will be required to pay a monthly service charge of 1.5% on any balance remaining after 30 days. The trial court considered it important that Mr. Shawn met with Wife in advance of commencing his representation of her, that he reviewed the engagement agreement with her and explained its terms to her, and that he also advised her that she could have independent counsel review the document. The trial court noted that Wife "is an intelligent and sophisticated businesswoman who served for many years as the vice-president and secretary of MAE" and concluded that she "understood the terms of the engagement agreement." This conclusion is supported by the evidence in the record.

### (2) Wife and Mr. Shawn shared the same understanding of the contract

The trial court found: "[T]he fact that [Wife] executed the engagement agreement following a discussion of its terms with Mr. Shawn indicates the parties[] reached a meeting of the minds. The Court concludes that Mr. Shawn and [Wife] shared the same understanding of the contract." Wife does not dispute that she signed the engagement agreement soon after meeting with Mr. Shawn and instructing him to proceed with dispatch. The trial court's conclusion is supported by the evidence in the record.

### (3) The terms of the engagement agreement are fair and reasonable

After reviewing the engagement agreement, the trial court concluded that its terms are fair and reasonable on the face of the agreement, including the hourly rates charged, and that "the fees ShawnCoulson ultimately charged [Wife] were fair and reasonable." The trial court stated that it "gave great weight to the expert testimony of Ms. Bruce," given her extensive credentials and experience and her application of the RPC 1.5(a) factors to the facts of this case.[14] The trial court also credited the opinion testimony of Mr. Noel, noting his nationally recognized expertise in business and commercial litigation. As explained in more detail below, the trial court discounted, at least in part, the testimony given by Wife's expert, Ms. Nichol.

The trial court methodically reviewed the facts of the case and applied them to the relevant factors set out in RPC 1.5(a). Addressing the first factor — "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal

---

[14]The trial court noted that the first eight factors articulated in District of Columbia Rule of Professional Responsibility 1.5 are identical to RPC 1.5 of the Tennessee Rules.

service properly" — the trial court held that ShawnCoulson "handled multiple aspects of representation for [Wife]. . . . Millions of dollars were at stake, and [Wife] required experienced, competent counsel to adequately defend her interests in unusually complex and sophisticated issues." The trial court described specific matters on which ShawnCoulson did substantial work, including advising Wife on the FCPA issues and the Gazprom contract, obtaining approval by the trial court for a forensic accounting, and positioning Wife to obtain a fair settlement with Husband. The trial court determined that the fact that Husband increased his formal $12 million offer of judgment to an ultimate settlement agreement worth over $37 million to Wife "demonstrate[s] the value of [ShawnCoulson's] work for [Wife]." The trial court found:

> A skilled and experienced international business lawyer like Mr. Shawn was able to bring this strategy to bear for [Wife] and investigate and identify what was, at best, evidence of significant business mismanagment by [Husband] — evidence that led to [Husband] offering [Wife] tens of millions of dollars to settle the case. . . . Through his experience, Mr. Shawn was able to suggest and execute the hiring of Deloitte, which knowledge itself was extremely valuable, as articulated by Ms. Bruce.

As to the second factor — "the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer" — the trial court found that Mr. Shawn "was not able to conduct other client business or seek new work when he was working for [Wife]." The trial court based this conclusion on the testimony of Mr. Shawn and the expert testimony of Ms. Bruce. The trial court held that, under the circumstances of this case, Wife's "non-payment of fees is particularly significant — and damaging — to the operations of a small law firm like ShawnCoulson."

With respect to the third factor — "the fee customarily charged in the locality for similar legal services" — the trial court again relied on the expert testimony of Ms. Bruce. It held that the rates charged by Mr. Shawn (initially $575 per hour, then later $595 per hour) and his paralegal ($195 per hour) are reasonable, given his high level of experience and expertise. The trial court noted Ms. Bruce's testimony that, "[i]n a large D.C. law firm, for example, an attorney of Mr. Shawn's experience often charges at rates of $750 or more," and that "in some large law firms, associates are billed to clients at $500 per hour or more." The trial court also credited Ms. Bruce's testimony that the "Adjusted Laffey Matrix," a matrix of reasonable hourly rates for attorneys of varying experience levels in the Washington-Baltimore area, further "supports the reasonableness of [ShawnCoulson's] fees." *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd on other grounds*, 746 F.2d 4 (D.C. Cir. 1984). Under that matrix, the trial court noted, Mr. Shawn's fees would have been between $671 and $686 per hour. The trial court also credited the testimony of Mr.

Noel that a few Shelby County attorneys charge as much as $500 per hour for certain sophisticated business matters. From this evidence, the trial court concluded that "Mr. Shawn's charges are well within the norm of and in accordance with rates for this work in this national area of expertise."

Regarding the fourth factor — "the amount involved and the results obtained" — the trial court noted that, at the time ShawnCoulson was hired as part of Wife's legal team, Husband had made no settlement offer in the divorce proceedings, and Husband and Mr. Germany had steadfastly denied Wife access to important MAE records. It commented: "[I]n general, [Wife] was 'seriously on the defensive.'" After ShawnCoulson became involved, Mr. Shawn's work led to the offer of judgment of $12 million, and then eventually to Wife's settlement amount in excess of $37 million. The trial court reiterated its finding that ShawnCoulson's "work can be directly linked to the increase in the settlement offer, demonstrating a significant value to the client."

Addressing the fifth factor — "the time limitations imposed by the client or by the circumstances" — the trial court found that Husband's lack of cooperation in discovery and the manner in which he was conducting MAE's business led Wife to ask Mr. Shawn for his full attention in her divorce proceedings. The trial court observed that Husband "did not keep [Wife] apprised of MAE business transactions as he was required to do; entered into suspect corporate agreements on MAE's behalf; disbursed $9 million of MAE's funds in contravention of the Special Master's Order; and did not provide the forensic auditors with all of the information sought." Husband did not meaningfully participate in the proceedings before the Special Master and "in some cases left those meetings early and refused to disclose his whereabouts in other meetings." Because of Husband's resistance, the trial court observed, Wife "made it clear that she was anxious for results and asked that her matter get Mr. Shawn's full efforts." In response, the trial court found, ShawnCoulson spent significant "amounts of time and resources in taking steps to compel [Husband's] compliance with his case obligations and to operate quickly as demanded by [Wife]."

As to the sixth factor — "the nature and length of the professional relationship with the client" — the trial court noted that ShawnCoulson's relationship with Wife lasted for less than a year, from November 2008 to September 2009. It stated: "The nature of the relationship was that of an experienced specialist being brought into a serious and protracted divorce contest to assist existing counsel in identifying, managing, and resolving issues in his new client's favor as rapidly and as expertly as possible." During the time in which Mr. Shawn was part of Wife's legal team, the trial court found, Wife placed "trust and confidence" in Mr. Shawn "as he helped guide her to a successful conclusion."

With respect to the seventh factor — "the experience, reputation, and ability of the lawyer or lawyers performing the services" — the trial court found that Mr. Shawn's level of experience and expertise was critical. It recited Mr. Shawn's qualifications, noting that he has practiced law for over 35 years, with a focus on international law and specifically on litigation and transactional work for foreign-owned companies with interests in the United States. The trial court again credited Ms. Bruce's testimony that Mr. Shawn is "recognized as an expert in corporate matters, specifically governance, shareholder derivative actions, and general advice regarding complex corporate matters. His particular expertise is in foreign and multinational business transactions which implicates his knowledge of the U.S. and foreign anti-bribery and anti-corruption laws and regulations." The trial court concluded that "Mr. Shawn was very capable of providing high-quality work for [Wife] in this matter."

As to the eighth factor — "whether the fee is fixed or contingent" — the trial court simply noted that ShawnCoulson's fee was fixed at the hourly rate set out in the engagement agreement.

The ninth and tenth factors in RPC 1.5(a) are not in the D.C. counterpart to the rule, and they are not particularly relevant in this case. There was no evidence at trial about any advertisements or representations regarding ShawnCoulson's fees, and it was undisputed that Wife's fee agreement with ShawnCoulson was in writing.

In addition, the trial court explained its reasons for substantially discounting the expert testimony by Wife's expert, Ms. Nichol, at least insofar as it concerned the fee award to ShawnCoulson.[15] The trial court observed that, while Ms. Nichol is a respected and experienced family law attorney, "she does not possess a particular skill or experience in the area of international law, and specifically has no experience with the FCPA, the Foreign Sovereign Immunity Act, or the United Kingdom's anti-bribery laws." The trial court also noted that many of the facts and assumptions undergirding Ms. Nichol's opinion testimony turned out to be erroneous. For example, Ms. Nichol was under the impression that ShawnCoulson had charged Wife a total of $650,000, when the fees charged were actually about $450,000. Also, some of the fees that Ms. Nichol thought had been charged to Wife were actually paid by MAE, not Wife. Ms. Nichol mistakenly understood that Deloitte was hired to give a valuation for MAE, when it was actually retained to perform a forensic audit

---

[15]Ms. Nichol's testimony was credited in part with respect to the fee award sought by Wheeler & Franks. A number of Ms. Nichol's recommended reductions as to the fees requested by Wheeler & Franks were adopted by the trial court.

-22-

of the company.[16]   Finally, although Ms. Nichol characterized the strategy of filing a shareholder derivative action as "flawed," she conceded that she did not know whether Mr. Shawn had ever in fact advocated such a strategy and was unaware that Mr. Shawn ultimately advised Wife not to file such an action.   Thus, in assessing ShawnCoulson's attorney fee claim, the trial court gave controlling weight to the expert testimony of Ms. Bruce and Mr. Noel.

Based on all of these considerations, the trial court concluded:  "ShawnCoulson's fees and expenses for work done from the inception of their engagement as [Wife's] lawyers until termination of the attorney/client relationship were reasonable and appropriate."

On appeal, Wife argues that the trial court abused its discretion in holding that ShawnCoulson's fees were reasonable and fair.  She claims the evidence at trial shows that, contrary to the trial court's findings, "[Mr.] Shawn proposed and developed unnecessary legal strategies, billed [Wife] at extraordinary rates for unnecessary legal and non-legal services, performed redundant and duplicative services, advocated wasteful measures, violated critical ethical rules governing legal conduct, and even potentially exposed [Wife] to potential liability in violation of his fiduciary duty to protect her interests."  Wife argues that the trial court erred in (1) failing to place the burden of proof on ShawnCoulson to prove the reasonableness of its fees, (2) failing to determine whether ShawnCoulson's fees were "required," (3) declining to consider the effect of unethical legal strategies, (4) using the wrong "relevant community" in its analysis, and (5) failing to address the significance of the "referral fee" from ShawnCoulson to Wheeler & Franks.  Instead of engaging in the proper analysis of the relevant factors, Wife contends, the trial court "merely accepted conclusory statements" by Mr. Shawn that his fees were reasonable. Wife insists that the trial court's conclusion was based on a "clearly erroneous assessment of the evidence."

We have carefully reviewed the record on appeal, including the transcripts of the trial testimony and the numerous exhibits.  Many of the trial court's factual findings in this case are based on its assessment of the witnesses' credibility.  Giving due deference to the trial court's credibility determinations, as explained below, our review of the record shows that the trial court's findings of fact are supported by substantial evidence.  Moreover, its analysis of the relevant factors in light of those findings of fact is astute and sensible.

Based on our review of the record, we reject Wife's argument that the trial court erroneously shifted the burden of proof to her to show that ShawnCoulson's fees are unreasonable.  The

---

[16]As noted by the trial court, "a forensic audit and a valuation are different procedures."  A valuation places a dollar value on the company, while the forensic audit in this case was conducted in order "to locate certain of [Husband's] and MAE's alleged hidden assets."

record shows that the trial court required ShawnCoulson to prove that its fees are reasonable, and that ShawnCoulson sustained this burden of proof.

The record does not support Wife's contention that ShawnCoulson's hourly rates are unreasonably high. According appropriate deference to the trial court's decision to credit the testimony of Ms. Bruce and Mr. Noel, the rate charged by Mr. Shawn is well within the range of reasonable hourly rates for attorneys with a comparable level of experience and expertise in the Washington, D.C. area, and not far above the top rate for a Shelby County attorney with expertise in sophisticated and complex commercial matters. The expert testimony credited by the trial court fully supports the trial court's holding that Mr. Shawn's hourly rate is within the range of reasonableness. We find no abuse of discretion in the trial court's conclusion that the rates charged by ShawnCoulson were reasonable.

Wife argues vigorously that many of the hours expended by ShawnCoulson were unreasonable, duplicative, and unnecessary. She contends that ShawnCoulson's research on Tennessee divorce law was unnecessary, argues that the fact that no shareholder derivative lawsuit was filed demonstrates that the exploration of such a lawsuit was a "rabbit trail," claims that the Deloitte forensic audit was of little benefit because it did not result in a valuation of MAE, and points to the fact that no government agency had threatened Wife with criminal prosecution as confirmation that such potential liability to Wife was merely "hypothetical" and not even shown to be "plausible."

The trial court below wisely rejected all of these arguments, as do we. Perhaps Wife, from the safety of her current perch and with the benefit of hindsight, now feels free to deride the attorneys' efforts as indulging flights of fancy at her expense. We do not. Short of finding a Shelby County attorney who is at once deeply knowledgeable about divorce litigation, international business law, the Foreign Corrupt Practices Act, terrorism laws, and money laundering schemes, Wife's array of legal challenges called for a team of lawyers with different skills, all of whom had to communicate with one another. ShawnCoulson had no choice but to get some familiarity with Tennessee divorce law in order to weave its research on MAE into the overall divorce strategy. The proof at trial showed that Husband's resistance to cooperation yielded only to the tactics Mr. Shawn devised, including the forensic audit of MAE and the threat of a shareholder derivative lawsuit. The proof also showed that the prospect of Wife being drawn into the vortex of Husband's allegedly seamy business dealings and the potential of civil or even criminal liability were hardly hypothetical. And the fact that Wife later developed a case of buyer's remorse about the settlement of her divorce litigation does not mean that the settlement was in fact unfavorable to her. Considering the evidence in the record as a whole, including the exhibits, Mr. Shawn's testimony, and the expert testimony of Ms. Bruce and Mr. Noel, we find substantial evidence to support the trial court's

holding that the hours expended by ShawnCoulson in its representation of Wife were reasonable.

We also reject Wife's argument that the trial court should have required ShawnCoulson to forfeit its entire fee because the 10% referral fee paid to Wheeler & Franks constituted a breach of ShawnCoulson's ethical obligations. The trial court declined to credit Wife's assertion that she was never told about the referral fee to Wheeler & Franks, but instead credited the attorneys' testimony that she was orally informed of the fee. RPC 1.5(e) requires that the division of work between the lawyers be proportional, that "the client agrees to the arrangement, and the agreement is confirmed in writing."[17] Tenn. Sup. Ct. R. 8, RPC 1.5(e). The trial court held that the division of the attorney fees between ShawnCoulson and Wheeler & Franks was not proportional, and it is undisputed that ShawnCoulson did not confirm the referral fee in writing to Wife. The trial court held, however, that any ethical breach by ShawnCoulson with respect to the referral fee did not rise to the level of "an ethical transgression of a most flagrant sort," which would have precluded any award of fees to ShawnCoulson whatsoever. *See Estate of Thompson*, M2011-00411-COA-R3-CV, 2012 WL 912859, at *15 (Tenn. Ct. App. Mar. 14, 2012) (quoting *White v. McBride*, 937 S.W.2d 796, 803 (Tenn 1996)). It reasoned that Wife was told about the fee at the inception of her business relationship with ShawnCoulson, and she ultimately paid no more in attorney fees than she agreed to pay under the ShawnCoulson engagement agreement.

The trial court's reasoning on this issue is sound. According appropriate deference to the trial court's decision to credit the attorneys' testimony over that of Wife, the evidence in the record supports the trial court's finding that Wife was informed of the referral fee at the beginning of her relationship with ShawnCoulson. Likewise, the evidence in the record does not preponderate against the trial court's factual finding that Wife did not pay more overall attorney fees because of the referral fee arrangement. Under these circumstances, we agree with the trial court that any ethical transgression was not "flagrant," and Wife suffered no prejudice. Accordingly, we cannot conclude that the trial court erred in declining to hold that

---

[17]RPC 1.5(e), which provides:

> (e) A division of a fee between lawyers who are not in the same firm may be made only if:
>     (1) the division is in proportion to the services performed
>     by each lawyer or each lawyer assumes joint responsibility
>     for the representation;
>     (2) the client agrees to the arrangement, and the agreement is
> confirmed in writing; and
>     (3) the total fee is reasonable.

Tenn. Sup. Ct. R. 8, RPC 1.5(e).

ShawnCoulson was precluded from collecting any fee whatsoever for its representation of Wife.

For all these reasons, we must affirm the trial court's conclusion that the fees ShawnCoulson charged to Wife are reasonable and appropriate, and we uphold the award of fees in the amount of $111,885.38.[18]

## Pre-judgment Interest

The trial court awarded ShawnCoulson pre-judgment interest at a rate of 7.5%,[19] from October 2009 to June 30, 2012, pursuant to Tennessee Code Annotated § 47-14-123. That statute provides: "Prejudgment interest . . . may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . ." Tenn. Code Ann. § 47-14-123.

On appeal, Wife argues that the award of prejudgment interest to ShawnCoulson was "legal error and should be reversed." She claims that "pre-judgment interest is not appropriate in a fee dispute over attorney fees," citing the Supreme Court's holding in *Alexander v. Inman*, 974 S.W.2d 689 (Tenn. 1998), to support this proposition.

In *Alexander*, the Supreme Court affirmed the trial court's denial of a prejudgment interest award in a suit to recover attorney fees. *Alexander*, 974 S.W.2d at 698. The Court held, "In reaching an equitable decision [about whether to award prejudgment interest], a court must keep in mind that the purpose of prejudgment interest is to fully compensate a plaintiff for the loss of the use of funds, not to penalize a defendant." *Alexander*, 974 S.W.2d at 697-98 (citing *Myint*, 970 S.W.2d at 927). In addition to principles of equity, a trial court may consider the degree of certainty of a plaintiff's claim and whether the amount is disputed on reasonable grounds. *Myint*, 970 S.W.2d at 927-28. The Supreme Court has explained:

> [T]he more clear the fact that the plaintiff is entitled to compensatory damages, the more clear the fact that the plaintiff is also entitled to prejudgment interest as part of the compensatory damages. The converse, however, is not necessarily true. The uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's

---

[18]Wife does not challenge ShawnCoulson's calculation of its attorney fees; she challenges only the reasonableness of the fees.

[19]Wife does not challenge the rate of prejudgment interest awarded, only the propriety of awarding prejudgment interest at all under the circumstances of this case.

grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

*Id.*

The *Alexander* Court's decision to affirm the trial court's denial of prejudgment interest was based in part on the fact that "both the right to recover the fees and the amount of such fees were quite reasonably disputed," as was evidenced by the "sound, yet widely differing, conclusions reached by the several jurists who have analyzed this case." *Alexander*, 974 S.W.2d at 698. The Court concluded that, "[i]n light of the extreme uncertainty of the final disposition of this case," an award of prejudgment interest would be a windfall to the plaintiff attorneys.

The trial court in the instant case examined the holding in *Alexander* but concluded that the fees claimed by ShawnCoulson were reasonable and that "an award of prejudgment interest is appropriate." We may reasonably infer from the trial court's reference to *Alexander* that it did not feel that ShawnCoulson's fees in this case were "quite reasonably disputed" by Wife or that the reasonableness of those fees was "extreme[ly] uncertain," and that the equities weighed in favor of awarding prejudgment interest to ShawnCoulson. Such a conclusion is well-supported in this record.

In determining whether to grant prejudgment interest on an award of attorney fees, the trial court has the discretion to ascertain whether the principles of equity are served by such prejudgment interest. "[T]he trial court [has] considerable deference in the prejudgment interest decision," and it "must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case." *Myint*, 970 S.W.2d at 927. Under the circumstances of this case, based on our review of the record as a whole, we cannot find that the trial court abused its discretion in awarding ShawnCoulson $22,896.08 in prejudgment interest.

### Service Charge

The engagement agreement between the parties includes an express provision permitting ShawnCoulson to assess a 1.5% monthly service charge in the event of non-payment: "We expect immediate payment on all [monthly] invoices and we will impose a service charge of one and one-half (1-1/2) percent, per month, on any balance due remaining after 30 days after the invoice date." The trial court below held that this provision was enforceable and that ShawnCoulson was entitled to collect its accrued service charges of $71,643.06. In reaching

-27-

that conclusion, the trial court again credited the testimony of Ms. Bruce, who testified "that it is generally acceptable to charge interest so long as the interest provision is in the engagement agreement." Ms. Bruce based her expert opinion on D.C. Bar Ethics Counsel Opinion 310, entitled "Propriety of Lawyer Charging Interest When the Client Fails to Pay Fees." That opinion provides: "[A] client's unexcused failure to meet a fee obligation does not allow a lawyer to seek to collect interest on the unpaid portion of the debt unless that is specifically provided for in the existing fee agreement."[20] The trial court also credited the testimony of Mr. Shawn himself, who is an adjunct professor of legal ethics at George Washington University Law School. The trial court rejected Wife's argument that the service charge provision in the engagement agreement was unenforceable, observing that Wife "presented no testimony or written evidence on this subject and offered no contrary authority." The trial court found that the D.C. authority on which Ms. Bruce and Mr. Shawn relied, while not binding, was persuasive. In conclusion, the trial court held, "given the plain terms of the parties' agreement, the expert testimony of Ms. Bruce and Mr. Shawn, and the ethics opinion relied upon by Ms. Bruce, it is reasonable and fair for ShawnCoulson to charge [Wife] interest at 1.5% per month on her unpaid bills."

On appeal, Wife argues that the trial court erred in awarding ShawnCoulson the 1.5% "service charge" provided for in the engagement agreement. Wife argues that a "service charge" is different from interest, in that services must be performed when a service charge is assessed. She argues that "ShawnCoulson never submitted evidence of what, if any, 'service' was performed or to what extent such service cost ShawnCoulson as much as 1.5% per month." Therefore, Wife claimed, the trial court "failed to enforce the contract as written, instead it simply applied the 1.5% 'service charge' to the balance due, effectively treating it the same as 'interest.' "[21] If the "service charges" were to be considered "interest," Wife claims, they would be violative of the usury statute, which limits allowable annual interest in contracts to 10% per year. *See* Tenn. Code Ann. § 47-14-103. Thus, Wife claims, the trial court's award of service charges in the amount of $71,643 must be reversed.

The "service charge" provision in the parties' engagement agreement is plain and unambiguous; it requires Wife to pay her bills immediately or be assessed a 1.5% service

---

[20]The issue in this bar opinion was whether the attorney could "ethically seek interest on amounts owed *even if there is no such provision in the fee agreement*." D.C. Bar Opinion 310, at ¶4 (emphasis added). The Bar decided to adhere to the long-standing rule that it is ethical for an attorney to "charge interest on a clients unpaid bills as long as that possibility had been agreed to by the client 'in advance of representation or in advance of a new stage of representation.'" D.C. Bar Opinion 310, at ¶4 (quoting D.C. Bar Opinion 11). The D.C. Bar observed that this "is consistent with the rule in many jurisdictions." As noted by the trial court in the instant case, Wife cited no contrary ethical rule from Tennessee or any other jurisdiction.

[21]The trial court did, in fact, refer to the 1.5% monthly "service charge" as "interest" in its analysis.

charge for each month on the overdue amount. In her appellate brief, Wife does not direct this Court to any part of the record in which the arguments she now raises on appeal were raised in the trial court. Arguments not raised in the trial court in the first instance are considered to be waived on appeal. **Barnes v. Barnes**, 193 S.W.3d 495, 501 (Tenn. 2006) ("Issues not raised in the trial court cannot be raised for the first time on appeal."). Finding no reason to disregard the unambiguous "service charge" provision in the parties' agreement, we affirm the trial court's enforcement of that provision.

### Costs of Collection

The parties' engagement agreement provides:

> If we must initiate arbitration to collect any outstanding balance on your account, you agree to pay our reasonable costs and attorneys' fees, or the time expended by us calculated at our hourly rates, for such action, if we are awarded our outstanding balance in whole or in part. If we must prepare a promissory note or other evidence of indebtedness, should your account become delinquent, you agree to pay our fees and costs for such services.

In the trial court proceedings, ShawnCoulson sought an award against Wife for the costs of collecting the balance of its attorney fees. The trial court declined to award ShawnCoulson its costs of collection under the above-quoted provision of the engagement agreement. It reasoned: "The contract, which was drawn by [ShawnCoulson], did not say that [Wife] would be required to pay attorney fees and cost[s] of collection if [ShawnCoulson] had to take any legal steps to collect their unpaid legal fees. The engagement letter only provided for collection costs in the event of arbitration which did not occur." Finding no other basis for an award to ShawnCoulson of its cost of collecting its fee from Wife, the trial court denied the law firm's request.

In its cross-appeal, ShawnCoulson cites three reasons why this Court should hold that the trial court erred in denying its request for the costs of collection. First, it claims that the trial court should have awarded the law firm its costs of collection as an element of damages that proximately resulted from Wife's breach of the engagement agreement. As a second theory of recovery, ShawnCoulson argues that the engagement agreement provides for recovery of the costs of collection in this proceeding because, even though the attempted arbitration proved impossible for unforeseen reasons, the law firm in fact concluded that it "must initiate arbitration" within the meaning of the engagement agreement. Finally, ShawnCoulson argues that the language in the engagement agreement evidences the parties' intent to place the burden of the cost of collection upon the party whose actions necessitate such costs, *i.e.*, Wife. ShawnCoulson argues: "This is particularly appropriate in the instant case because arbitration

was rendered impossible, and the judicial proceeding was the only available procedure for ShawnCoulson to enforce its statutory and contractual lien."

Our first task in addressing this issue is to interpret the provision in the parties' engagement agreement on the costs of collection. As we have indicated above, issues of contractual interpretation are questions of law that are reviewed *de novo*, with no presumption of correctness in the trial court's interpretation. *Perkins*, 380 S.W.3d at 80. "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). Initially, we seek to ascertain the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)). The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630. If the contractual terms are ambiguous, that is, susceptible to more than one reasonable interpretation, we then apply other established rules of construction to determine the contracting parties' intent. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). The meaning of the contract may become a question of fact if ambiguity remains after application of the appropriate rules of construction. *Planters Gin Co.*, 78 S.W.3d at 890 (quoting *Smith v. Seaboard Coast Line R.R.*, 639 F.2d 1235, 1239 (5th Cir. Unit B Mar. 1981 (per curiam))).

We agree with the trial court's reading of the contractual provision at issue. The engagement agreement clearly sets forth the situation in which Wife may be required to pay ShawnCoulson's costs of collection. In pertinent part, the provision states: "If [ShawnCoulson] must initiate arbitration to collect any outstanding balance," then Wife agrees to pay the firm's "reasonable costs . . . *for such action,* if [ShawnCoulson is] awarded our outstanding balance in whole or in part." The "for such action" language can only refer to the arbitration that ShawnCoulson "must initiate." Thus, the provision in the engagement agreement drafted by ShawnCoulson provides only for the collection of the costs of an arbitration action to collect the firm's outstanding fees.

ShawnCoulson insists that this provision in the engagement agreement should be interpreted to hold Wife contractually bound to pay the costs of collection where, as here, arbitration was rendered impossible by unforeseen circumstances and a judicial proceeding was the only means of collecting its fees from Wife. It argues that the contractual language evidences the

-30-

parties' general intent to prevent ShawnCoulson from having to "spend the entire fees which [Wife] failed to pay in an effort to recover them."[22]

Indeed, in any action to collect attorney fees, "the costs of litigation are likely to substantially deplete any recovery for either the attorney or the client . . . and they may indeed equal or exceed the amount of the disputed fees." Cross-Appellant's Brief at 69 (quoting Alan Scott Rau, *Resolving Disputes over Attorneys' Fees: The Role of ADR*, 46 SMU L. Rev. 2005, 2016 (1993)). Nevertheless, we are unable to award the costs of collection without a legal basis for doing so. ShawnCoulson's engagement agreement provides no legal basis for such an award.[23]

ShawnCoulson argues in the alternative that the trial court should have awarded the law firm its costs of collection as compensatory damages for Wife's breach of the agreement. We must respectfully reject this argument as well. Tennessee follows the "American Rule," that a party to a civil proceeding may not recover attorney fees unless there is either a contractual or statutory provision allowing for such recovery. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 212 (Tenn. 2012). Because ShawnCoulson has pointed to no contractual or statutory basis that authorizes it to recover its costs of collection from Wife, we must affirm the trial court's decision to deny the law firm's request.

Any other arguments raised by the parties and not expressly addressed herein have either been deemed to lack merit or are pretermitted by our decision.

---

[22]ShawnCoulson claims that its costs of collection amounted to $502,373.39, consisting of outside attorney fees and expert witness fees ($290,402.17), ShawnCoulson's own fees and expenses ($169,176.25), and a service charge of 1.5% per month with respect to its fees ($42,794.97).

[23]ShawnCoulson also argues that it should be awarded its costs of collection based on a different provision of the engagement agreement, which states: "If any matter for which you engage us includes any monetary recovery, you agree to provide us with a lien on such recovery for accrued fees and costs." Respectfully, this provision is inapposite and does not provide a legal basis for an award of the costs incurred to collect outstanding fees.

## CONCLUSION

The decision of the trial court is affirmed.  Costs on appeal are to be taxed equally to Appellant/Cross-Appellee Dorothy Lavon W. Coleman and Appellee/Cross-Appellant ShawnCoulson, LLP, and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE