IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 13, 2024 Session

## ROBERT "WOODY" DEW ET AL. v. ADRIAN'S INC. ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 1953600-2        Clarence E. Pridemore, Jr., Chancellor**

———————————————————

**No. E2022-01629-COA-R3-CV**

———————————————————

Following mediation, family members signed a settlement agreement resolving their business dispute. One party then sought to withdraw from the agreement. The trial court determined that the party's ability to withdraw was limited and ordered him to close on the transactions contemplated by the agreement. Because we conclude that the settlement agreement's language was ambiguous, we vacate and remand for an evidentiary hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON II, J., joined.

Travis Hawkins, Chattanooga, Tennessee, for the appellant, Robert Woody Dew.

Christopher T. Cain and W. Allen McDonald, Knoxville, Tennessee, for the appellees, Adrian's Inc. a/k/a Tennessee Webbing Products, Steven Dew, and Marilyn Dew.

Ronald J. Attanasio, Knoxville, Tennessee, for the appellee, Karen Dew.

**OPINION**

**I.**

**A.**

Robert "Woody" Dew, along with his brother, Steve Dew, and their mother, Marilyn Dew, incorporated Adrian's Inc. a/k/a Tennessee Webbing Products more than thirty years ago. Since then, Adrian's Inc. has always been a closely held corporation. According to

Woody Dew, he had started the business as a sole proprietorship and "desired to share his created good fortune with his family who had fallen on difficult times."

While Adrian's Inc. continued to experience good fortune over the ensuing decades, the family's relationships did not fare as well. In Woody's view, the deterioration of the relationships was caused by "Steve Dew's desire for exclusive control of the company and access to its funds." Steve Dew and Marilyn Dew countered that the deterioration was caused by "Woody's narcissistic behavior." According to them, "employees did not respect [Woody Dew] or his dictatorial leadership style." So Steve Dew replaced Woody Dew as president of Adrian's Inc. Woody Dew was later removed as an officer and director.

Adrian's Inc. continued to pay Woody Dew a substantial salary for years following his removal as president. Woody Dew claimed that the company had agreed to continue paying him for life. However, Steve Dew and Marilyn Dew contended that Woody Dew continued to receive payment only because he "essentially blackmailed the company into paying him . . . by misrepresenting his willingness to negotiate a retirement." After some time, the company stopped "paying him to do[] nothing."

In response, Woody Dew sued Adrian's Inc., Steve Dew, and Marilyn Dew.[1] He made claims of breach of fiduciary duty, breach of the duty of good faith and fair dealing, breach of contract, and civil conspiracy. Adrian's Inc. counterclaimed, seeking, among other things, to recover the money paid to Woody after his removal "under applicable law of unjust enrichment."

### B.

After years of extensive litigation, the parties attended a lengthy mediation that resulted in a signed settlement agreement. According to the agreement, Woody Dew would assign most intellectual property rights to the company, reassign his stock to it, and not compete with it for five years. In exchange, Adrian's Inc. agreed to pay Woody Dew a substantial sum and to transfer ownership of two Florida condos to him. Two provisions of the settlement agreement addressed the parties' responsibilities regarding the condos:

> 3. Adrian's to transfer 2 [Florida] condos to Woody, free and clear of all liens. Rented condo to be conveyed as part of closing on Adrian's stock; other Condo to be conveyed on [a specific date].
> . . .

---

[1] Karen Dew intervened in the action "to protect her marital property interest in the corporate stock and assets" in a separate action for divorce from Woody Dew.

9. Defendants to provide following the [sic] information on Florida condos: lease on one condo, HOA fees, taxes, expenses and maintenance over past 3 years, insurance. Woody's due diligence to be completed within 10 days after receipt of information described herein.

Shortly after mediation, Woody Dew sent the defendants a succinct email: "Although I have not yet received the current insurance costs for the two condos, regrettably I am rejecting your offer of settlement." The defendants moved to enforce the settlement agreement.

According to Woody Dew, the settlement agreement's provision for a "due diligence" period necessarily meant that he had the ability to withdraw from closing. During the due diligence period, Woody Dew "became aware" that the condos' HOA prohibited leasing them for periods shorter than one year, "dramatically" decreasing their potential value. So he exercised the option to withdraw.

But upon the arguments of counsel, the court ordered Woody Dew "to close on the transactions set forth in the Settlement Agreement." The settlement provided that his due diligence period began upon receipt of specific information about the condos: the "lease on one condo, HOA fees, taxes, expenses and maintenance over past 3 years, and insurance information." So the court concluded that any right to withdraw from the settlement had to be related to those enumerated items. The settlement made no reference to restrictions on short-term leases. Thus, the court concluded that "Woody Dew d[id] not have a right to withdraw from the parties' Settlement Agreement based on the HOA restrictions."

Woody Dew moved to alter or amend the order, arguing that the court should "at a minimum stay enforcement of its Order pending an evidentiary hearing" to resolve ambiguities in the settlement agreement. *See* TENN. R. CIV. P. 59.04. The court denied Woody Dew's request.

## II.

Woody Dew contends that the trial court erred in enforcing the settlement agreement. Because a settlement agreement is a contract between the parties to the litigation, contract law governs its construction and enforceability. *Waddle v. Elrod*, 367 S.W.3d 217, 222 (Tenn. 2012). Contract interpretation presents a question of law, which we review de novo with no presumption of correctness. TENN. R. APP. P. 13(d); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (citing *Perkins v. Metro. Gov't of Nashville & Davidson Cnty.*, 380 S.W.3d 73, 80 (Tenn. 2012)); *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011).

The "cardinal rule" of contract interpretation "is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal

3

principles." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (citing numerous cases). The parties' intent "is presumed to be that specifically expressed in the body of the contract." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002); *see Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 676 (explaining that "the written words [are] the lodestar of contract interpretation"). In reviewing the body of the contract, courts apply "the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Dick Broad Co.*, 395 S.W.3d at 659; *84 Lumber Co.*, 356 S.W.3d at 383.

If the contract's language is clear and unambiguous, courts enforce the contract as written. *Dick Broad. Co.*, 395 S.W.3d at 659; *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Planters Gin Co.*, 78 S.W.3d at 890 ("If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes."). But where a contract's language is ambiguous, the parties' intent cannot be derived solely from the four corners of the contract. *Planters Gin Co.*, 78 S.W.3d at 890; *see McKee v. Cont'l Ins. Co.*, 234 S.W.2d 830, 831 (Tenn. 1950) (recognizing that courts "can only enforce the contract which the parties themselves have made"). Language is ambiguous when "it is of uncertain meaning and may fairly be understood in more ways than one." *Planters Gin Co.*, 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 191 (Tenn. 1973)).

Here, the settlement agreement's provision that "Woody's due diligence to be completed within 10 days after receipt of information described herein" is "susceptible to more than one reasonable interpretation." *See Allstate Ins. Co.*, 195 S.W.3d at 611. The parties agree that Woody Dew had the right to withdraw from the agreement based on the provision. But they disagree as to what "Woody's due diligence" encompasses. The defendants claim that "the only reasonable interpretation" of the settlement agreement's due diligence provision "was that Woody's ten-day due diligence was limited to [things that may be revealed by] the documents and information described in the agreement." But Woody argues that his "due diligence" could extend to other matters. In his eyes, receipt of the information described in the agreement merely started the clock on the "due diligence" period. Because both parties' interpretations of the "due diligence" provision are plausible, we conclude that the settlement agreement is ambiguous.

When a contract is ambiguous, courts "must apply other established rules of construction to aid in determining the contracting parties' intent." *Dick Broad. Co.*, 395 S.W.3d at 659 (citing *Planters Gin Co.,* 78 S.W.3d at 890). To that end, the defendants seek consideration of the ambiguous phrase in the context of the whole agreement. *See Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) (holding that "the entire contract should be considered in determining the meaning of any or all its parts"). But the one-page agreement is silent as to the scope of the due diligence provision. For his part, Woody Dew contends that we should construe

4

the ambiguity against the defendants as drafters of the agreement. *See Allstate Ins. Co.,* 195 S.W.3d at 612 (recognizing that "[a]n ambiguous provision in a contract generally will be construed against the party drafting it" (citing *Hanover Ins. Co. v. Haney,* 425 S.W.2d 590, 592 (1968))). But the record demonstrates that all parties, not just the defendants, worked on drafting the settlement agreement during mediation.

Where "ambiguity remains after [the court] ha[s] applied the pertinent rules of construction," the meaning of the contract becomes a question of fact. *Planters Gin Co.,* 78 S.W.3d at 890 (citing *Smith v. Seaboard Coast Line R. Co.,* 639 F.2d 1235, 1239 (5th Cir. 1981)). Courts then may use evidence beyond the text to construe and enforce the contract. *Individual Healthcare Specialists, Inc.,* 566 S.W.3d at 689; *Allstate Ins. Co.,* 195 S.W.3d at 612. But the record here does not contain evidence as to the intended meaning of "Woody's due diligence." Thus, an evidentiary hearing is necessary to resolve the ambiguity.

## III.

We conclude that the language in the parties' settlement agreement is ambiguous. Thus, we vacate the trial court's order granting the motion to enforce the settlement agreement and dismissing the case with prejudice and remand for further proceedings consistent with this opinion.

_s/ W. Neal McBrayer_
W. NEAL MᴄBRAYER, JUDGE
